UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**IN ADMIRALTY**

FILED by _H.A.R._ D.C.

JUL 11 2014

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

-----------------------------------------------------X
OWL SHIPPING LLC,                                :
                                                 :
                    Plaintiff,                   :
                                                 :
        - against -                              :
                                                 : **14-cv-22594-Scola/Otazo-Reyes**
DALIAN SUNTIME INTERNATIONAL TRANSPORTATION CO., LTD. A/K/A,
DALIAN SUNTIME INT'L TRANSPORTATION CO., LTD. A/K/A,
DALIAN SUNTIME INTERNATIONAL TRANSPORTATION COMPANY., LTD. A/K/A,
DALIAN SUNTIME INTERNATIONAL TRANSPORTATION CO., LIMITED. A/K/A,
DALIAN SUNTIME INTERNATIONAL TRANSPORTATION COMPANY, LIMITED.
                                                 :
                    Defendant.                   :
-----------------------------------------------------X

**<u>VERIFIED COMPLAINT</u>**

Plaintiff, OWL SHIPPING LLC. ("Plaintiff" or "Owl"), by and through its attorneys, The

Chartwell Law Offices, LLP, as and for its Verified Complaint against the Defendant, DALIAN

SUNTIME INTERNATIONAL TRANSPORTATION CO., LTD. a/k/a, DALIAN SUNTIME

INT'L TRANSPORTATION CO., LTD. a/k/a, DALIAN SUNTIME INTERNATIONAL

TRANSPORTATION COMPANY., LTD. a/k/a, DALIAN SUNTIME INTERNATIONAL

TRANSPORTATION CO., LIMITED. a/k/a, DALIAN SUNTIME INTERNATIONAL

TRANSPORTATION COMPANY, LIMITED, ("Defendant" or "Dalian"), alleges, upon

information and belief, as follows:

     1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 U.S.C. § 1333.

2.      Venue is proper in this district because there is or will be during the pendency of this action property due and owing to the Defendant within this district and in the hands of a third party garnishee, as will be more fully discussed herein.

3.      At all material times to this action, Plaintiff was a foreign company duly organized and operating under Marshall Islands law and is the Owner of the M/V OWL ("Vessel").

4.      Defendant was and is a foreign corporation or other business entity organized and existing under foreign law with an office and place of business in China.

5.      On June 18, 2014, Plaintiff, as owner, entered into time charter party ("Owl Charter") with riders with Defendant Dalian, who was the charterer of the Vessel.

6.      By way of this time charter party, Plaintiff Owl chartered the Vessel to the Defendant Dalian for a period of minimum 5 to 7 months at a daily hire rate of US $ 9,500. A true and accurate copy of this time charter party is attached hereto as Exhibit A. (hereinafter referred to as "Ex. A").

7.      Defendant Dalian informed the master of the Vessel that the Vessel was fixed on a voyage sub-charter, but did not identify the sub-charterer or provide a copy of the sub-charter party.

8.      At Clause 7 of the Owl Charter, the parties agreed that Dalian would pay for all the bunkers while the Vessel was on hire, except as otherwise provided.  Ex. A, p.51.

9.      Clause 11 of the Owl Charter provides that first hire and value of bunkers on delivery shall be paid within 3 banking days after the vessel's delivery.  It further provides that where there is a failure to make timely and regular payment of hire and / or bunkers, charterers will be provided with 3 banking days by the owners to rectify the failure.  Finally, this clause

provides that if the charterers fail to pay the amount owed within 3 banking days of their receipt of the owner's aforementioned notice, owners shall be entitled to withdraw the Vessel.  Ex. A at 54-55.

10.     Clause 23 of the Owl Charter provides that the Plaintiff shall have a lien upon all cargoes and sub-freights for any amounts due under this charter party.  Ex. A at 57.

11.     Finally, the charter party calls for London Arbitration for resolution of any disputes arising out of the contract.  Ex. A at p. 64.

12.     The Plaintiff delivered the Vessel to the Defendant on June 19, 2014, in accordance with the terms of the charter party.

13.     The Vessel immediately loaded a cargo of steel cargoes at Shanghai, China and was expected to load at two further Chinese ports, Changsu and Rizhao.

14.     Non-party, Eagle Shipping International (USA) LLC ("Eagle") was and is the manager of the Vessel at all material times.

15.     On June 19, 2014, Eagle, on behalf of Plaintiff Owl, sent an invoice in the amount of $496,032.25 to the Defendant Dalian by email pursuant to Clause 11 of the charter party. This amount represented 15 days' hire and bunkers on delivery of the Vessel.

16.     Pursuant to Clause 11 of the Owl Charter, payment of this invoice was due on June 24, 2014, but no payment was made by the Defendant.

17.     On June 24, 2014, Eagle, on behalf of Plaintiff Owl, sent an anti-technicality notice pursuant to Clause 11(b) of the charter party and sent another on June 26, 2014.  These notices gave the Defendants three clear banking days to make payment, threatened to suspend performance and withdraw the Vessel in the event payment was not made.  The anti-technicality notices are attached hereto as Ex. B.

18.     To date, Defendant has failed to pay for the bunkers and hire, as invoiced and demanded in the two anti-technicality notices.

19.     Plaintiff was forced to terminate the Owl Charter and withdraw the Vessel on July 2, 2014 as a direct and proximate result of Defendant Dalian's breach of their obligation to pay hire and bunkers in accordance with the terms of the charter.

20.     Upon information and belief, the Defendant Dalian never possessed the money to perform on the Owl Charter dated June 18, 2014 when they fixed that charter with the Plaintiff.

21.     Plaintiff has suffered damages in the amount of US $ 1,330,000, which represents the total estimated earnings of the Vessel for the remainder of the charter party term less what Plaintiff was able to earn in mitigation.

**COUNT ONE: MARITIME ATTACHMENT**

22.     Defendant Dalian is currently involved in another charter with non-party Oriole Shipping LLC pursuant to a separate charter party dated June 13, 2014.  ("Oriole Charter").

23.     The Oriole Charter contains nearly identical terms as the Owl Charter dated June 18, 2014 between Plaintiff OWL and Defendant Dalian.

24.     The MV ORIOLE is currently trading in China and is expected to load additional cargo in Shanghai, China on or about July 12, 2014.

25.     Cargo for the account of non-party Duferco Steel, Inc. ("Duferco" or "Garnishee") has been loaded and/or more may be loaded in Shanghai.

26.     Shortly after the bills of lading are issued, Duferco will make freight payments to Defendant Dalian, as charterer of the Vessel.

27.     Duferco Steel, Inc. has an office and place of business within this judicial district at 3470 NW 82nd Ave, Suite 640, Miami, FL 33122.

28.     The terms of the OWL Charter Party call for arbitration in London, England.

29.     As best as can now be estimated, Plaintiff expects to recover the following amounts in London Arbitration :

| | | | |
|---|---|---|---|
| A. | Principal claim: | | $1,141,402.07 |
| B. | Estimated interest on claims: 4.5%, compounded quarterly | | $106,863.33 |
| C. | Estimated recoverable costs: (200,000 GBP) | | $342,554.00 |
| **Total** | | | **$1,590,819.40** |

30.     The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District including but not limited to <u>Duferco Steel, Inc.</u>, which are believed to be due and owing to the Defendant.

31.     The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any property of the Defendant held by Duferco Steel, Inc. or any garnishees within the District for the purpose of obtaining security for the imminent London Arbitration proceedings.

**WHEREFORE**, Plaintiff prays:

A.      That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint, failing which  default judgment be entered against it in the sum of **$1,590,819.40.**

B.      That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of **$1,590,819.40** belonging to, due or being transferred to, from, or for the benefit of the Defendant, including but not limited to such property as may be held, received or transferred in Defendant's name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of Duferco Steel, Inc. or any banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Verified Complaint;

C.      That pursuant to 9 U.S.C. §§201 et seq. this Court recognize and confirm any arbitration award or judgment in Plaintiff's favor against the Defendant as a judgment of this Court;

D.      That this Court award Plaintiff the attorneys' fees and costs incurred in this action; and

E.      That the Plaintiff have such other, further and different relief as the Court deems just, proper and equitable.

Dated: July 11, 2014
Miami, FL

The Plaintiff,
OWL SHIPPING LLC,


By:_____
Krista Fowler Acuña, Esquire
Florida Bar No.: 650791
kfacuna@chartwelllaw.com
The Chartwell Law Offices, LLP
200 South Biscayne Boulevard, Suite 300
Miami, Florida 33131-5322
Telephone: (305) 372-9044
Telefax:     (305) 372-5044
Attorneys for *Owl Shipping LLC*

## ATTORNEY'S VERIFICATION

State of Florida            )
                            )      ss.:    Miami
County of Miami-Dade        )

1.  My name is Krista Fowler Acuña.

2.  I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.  I am a partner in the firm of The Chartwell Law Offices, LLP, attorneys for the Plaintiff.

4.  I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.   The reason why this Verification is being made by the deponent pursuant to Local Admiralty Rule A(5) and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.   The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.   I am authorized to make this Verification on behalf of the Plaintiff.

Dated:   July 11, 2014
Miami, FL

_____
Krista Fowler Acuña, Esquire
Florida Bar No.: 650791
kfacuna@chartwelllaw.com
The Chartwell Law Offices, LLP
200 South Biscayne Boulevard, Suite 300
Miami, Florida  33131-5322
Telephone:  (305) 372-9044
Telefax:     (305) 372-5044
Attorneys for *Owl Shipping LLC*

# EXHIBIT A

**Pantelis, Pantelis**

发件人: steve liang/bromar shipping
日期:2014-06-18 6:28 PM (GMT+08:00)
收件人: Chen Chunxiao
抄送: bromar ops
主题: MV.OWL /SUNTIME ---CLEAN RECAP 18,JUNE,2014

Good day from Bromar Shipping Co. ltd!

Email: chartering@bromar.com.cn (Pls add our email addr to your list)

TO:SUNTIME/ADA JIANG
TO:EAGLE BULK/JUNE
FM:BROMAR/STEVE +SILVER

RE:MV.OWL /SUNTIME ---CLEAN RECAP 18,JUNE,2014
================================================

THANKS FOR YOUR SUPPORT,PLSD TO DRAW CLEAN RECAP MUTUALLY AGREED ASF:

NAME:            OWL
IMO:             9441386
YARD:            YANGZHOU DAYANG, CHINA
BUILT:           JULY 2011
FLAG:            MARSHALL ISLANDS
CLASS:           LR
TYPE:            GEARED SINGLE DECK BULK CARRIER, STRENGTHENED FOR HEAVY CARGOES, HOLDS NO. 2 AND
4 MAY BE LEFT EMPTY
DWAT:            57,809 MT ON 12.95 M SSW, TPC 59.24
GRT/NRT:         33,045 / 20,108
LOA/BEAM:        189.99M / 32.26M
GRAIN M3:        H1= 13,258 ; H2= 14,891 ; H3= 14,800 ; H4= 14,891 ; H5= 13,710 ; TOTAL = 71,551 BALE
M3:              H1= 12,922 ; H2= 14,518 ; H3= 14,434 ; H4= 14,518 ; H5= 13,365 ; TOTAL = 69,760
H/H:             5 HOLDS SUITABLE FOR GRAB DISCH / 5 HATCHES MACGREGOR FOLDING TYPE
CRANES:          4 X 35.0 MT SWL (HOOK MODE) / 28.0 MT SWL (GRAB MODE) ELECTRO HYDRAULIC DECK
CRANES, DESIGNED AND CLASS APPROVED TO OPERATE WITHIN THE DESIGNATED CAPACITIES ONLY WITH NO SIGNIFICANT
MOVEMENT OF THE SHIP DUE TO WAVE                ACTION AND CONDITIONS TO BE LESS THAN
BEAUFORT FORCE 2, DOUGLAS SEASTATE 1.
GRABS:           4 X 14.0 CBM GRABS EQUIPPED WITH SPILL PLATES FOR FREE FLOWING CARGO ONLY HATCH
COVERS: NO. 1= 17.20M X 17.02M ; NO. 2-5= 20.64M X 18.64M
SPEED:           ABT 14.0 KN IN BALLAST ON ABT 36 MT IFO , AND ABT
13.50 KN LADEN ON ABT 35 MT IFO, UP TO BF4/DSS3 (1.25M SWH), PROVIDED NO NEGATIVE EFFECTS OF CURRENTS OR
SWELLS AND NO HULL FOULING DUE TO EXTENDED STAYS IN PORT.               ALL FIGURES GIVEN BASIS FULL
SEA DAYS ONLY AND AS AN AVERAGE OF ALL DAYS SEA PILOT TO SEA PILOT.
CONS.:           IN PORT: ABT 2.8 MT IFO PER DAY IDLE, AND ABT 5.8 MT IFO PER DAY WORKING CRANES
VESSEL USES MDO ENTERING/LEAVING PORT, WHEN MANEUVERING AND IN NARROW, SHALLOW OR CONGESTED WATERS,

1

RIVERS, STRAITS, CANALS, WHEN BALLASTING/DEBALLASTING OR HEATING FUEL IN COLD WEATHER.
OWNERS WARRANT THE FOLLOWING:
ABT 12.0KN BALLAST / ABT 11.5KN LADEN ON ABT 26 MT IFO UP TO BF4/DSS3 (1.25M SWH),PROVIDED NO NEGATIVE
EFFECTS OF CURRENTS OR SWELLS AND NO HULL FOULING DUE TO EXTENDED STAYS IN PORT.
ALL FIGURES GIVEN BASIS FULL SEA DAYS ONLY AND AS AN AVERAGE OF ALL DAYS SEA PILOT TO SEA PILOT.


IFO SPEC:        RMG 380 CST ISO 8217:2005
MDO SPEC:        DMB ISO 8217:2005
DESCRIPTION ALL ABOUT
FOR
1.Charterers :DALIAN SUNTIME INT'L TRANSPORTATION CO., LIMITED
    Tel: 0086-411-82789898    Fax: 0086-411-82789090/82485333
    Address: 4f,No.349,Changchun Rd,Xigang District,Dalian City,Liaoning Province,CHINA
    P&I UK


2.Owners : Owl Shipping LLC - c/o eagle


3.DELILVERY: DLOSP LONGKOU,CHINA ATDNSHINC.


4.LAY/CAN: 0001/2400 HRS LT 20/JUN ~ 22/JUN, 2014
    i CASE VSL DEPARTURE LONGKOU PRIOR LAYCAN, SAILING COST(HIRE+BUNKER)FROM DELIVERY PORT TO 1ST LOADING
PORT,TO BE FOR CHTRS ACCT


5.FOR PERIOD OF MIN 5 TO ABOUT 7 MONTHS (ABOUT MEANS +/- 15 DAYS)
    FOR WW TRADING ALWAYS VIA SP/SB/SA(S) ALWAYS ALFOAT always accessible, ALWAYS WITHIN IWL ALWAYS VIA
ICE FREE PORTS. Vessel not to follow ice breakers or force ice.


6.CARGO : CARGO CARRIED ALWAYS HARMLESS, LAWFUL, SUITABLE FOR MARINE TRANSPORTATION AND TO BE LOADED,
STOWED AND CARRIED IN STRICT ACCORDANCE WITH ALL
    INTERNATIONAL LAW INCLUDING IMSBC, AND LOCAL REGULATIONS AND VESSELS' CERTIFICATES.cargo trading
clause as per ows profoma cp cl 47,and  dele "sulphur, Sulphur," ie Sulphur allowed.


Protective Clause for Sulphur:


Charterers permitted to carry one cargo of sulphur during the currency of the Charter Party,chtrs shall
make vessel' s holds tb grain clean standard, in accordance with relevant local independent surveyors'
satisfaction before redelivery . Prior to loading such cargo, Charterers to supply at their expense
·ufficient "SulphurBlock" (or equivalent) for coating all surface areas of Vessel' s holds in direct
:ontact with sulphur cargo and arrange shore labour for its application to Master' s satisfaction.
If Vessel' s crew requested to apply "SulphurBlock" on Vessel' s holds, Charterers to pay a crew bonus
of US$ 8,000 lumpsum direct to Owners for such work and supply any materials for its application,
including but not limited to any special equipment and/ or protective clothing for the crew.


Upon completion of discharge, Charterers to supply sufficient "SulphurSlip" (or equivalent) as
recommended by products manufacturers and arrange at their time, risk and expense for shore labour to
remove "SulphurBlock" from side of holds to Master' s satisfaction which not to be unreasonably
withheld and to the satisfaction of an independent surveyor.  However, if Charterers request Vessel' s
crew to undertake such work they will pay a crew bonus of US$ 8,000 lumpsum direct to Owners and supply
sufficient quantity of "SulphurSlip" including any equipment and/ or materials as recommended by
products manufacturer.   Any expense or time lost removing "SulphurBlock" to be entirely for
Charterers' account.


To protect and neturalise water collected in hold bilges,  Charterers to supply sufficient "Bilgecoat
as requested by Master and deliver to Vessel at the load port or, as alternative, supply sufficient bags
of caustic soda  flakes or pearl which when dissolved in FW makes 100 litres of alkaline solution.
All cargoes to be loaded, stowed, discharged in strict conformity with IMO and local regulations. Any
extra fittings/equipment/expenses, etc., which are required to observe such regulations to be undertaken
by Charterers at their time/expense.

045

All consumable and standard protective material, fresh water, brushes, ladders, etc., to be arranged and paid for by Charterers.

After completion of loading of a "dirty" cargo, all affected/polluted areas/ship's facilities and on completion of discharge, vessel's holds and other ship's facilities affected by the loading thereof, to be thoroughly washed down with fresh water to Master's satisfaction at Charterers' account/time and exp.

7.REDELIVERY:   REDELY DLOSP 1SP WITHIN FOLLOWING RANGE, PICO ATDNSHINC
- TUTICORIN /JAPAN RANGE
- MONTREAL / BAHIA BLANCA RANGE INC. USG / MEXICAN GULF / CARIBBEAN' SEA
- VANCOUVER / VALPARAISO RANGE
- SKAW / PASSERO RANGE INC. FULL MEDITERRANEAN / BLACK SEA / UK / BALTIC RANGE
- GIB/MAPUTO RANGE

8.HIRE: USD 9,500 PDIOT PAYABLE 15 DAYS IN ADVANCE,first 15 days hire plus value of BOD to be paid to ows bank within 3 banking days after vsl delivery

   ILOHC: USD5,000 L/SUM EXCL REMOVAL/DISPOSAL OF DUNNAGES/DEBRIS/LASHING MATERIALS,etc

10.C/E/V: USD1,350   PMPR

11.BUNKER CLAUSE:
BUNKER ON DELY   - HSFO : ABT 500-600 MT   / MGO   : ABT 20   MT
BUNKER ON REDELY - ABT SAME QTTY AS ON DELY
BUNKER PRICE     - HSFO : USD   620 PMT / MGO   : USD 950   PMT
CHTRS HAVE OPTION TO VIA CIS,RUSSIA FOR BUNKERING ONLY

- OWNERS AND CHRTRS SHALL COMPLY WITH THE LATEST ECA REGULATION ISSUED 1ST AUG 2012.
- CHARTERER SHALL COMPLY WITH REG.14 OF MARPOL ANNEX VI, THE SULFUR CONTENT LIMIT VALUE FOR A FUEL OIL USED IN THE "GLOBAL CAP", I.E., OUTSIDE OF EMISSION CONTROL AREAS, WHICH WILL CHANGE FROM 4.50% M/M TO 3.50% M/M ON 1 JAN 2012. FAILING WHICH CHARTERERS SHALL REIMBURSE FOR ALL AND ANY INCURRED LOSS OF DAMAGE, AND OWNERS ARE EXEMPTED FROM ANY PENALTY.

'2.Piracy clause :
· NOTWITHSTANDING OWNERS RIGHTS UNDER CONWARTIME/BIMCO PIRACY CLAUSE AND ANY OTHER
   CLAUSE UNDER THE CP, OWNERS AGREE TO ALLOW VESSEL TO PROCEED THROUGH JWRC ZONE ON THE
   FOLLOWING TERMS - CHRTRS TO BE RESPONSIBLE U P TO MAX USD 100,000 OR AS PER THE ACTUAL
   INVOICE WHICHEVER IS LESS AGAINST ANY /ALL INSURANCES (EWRIP, CREW WAR BONUS, K&R)
   AND ANY OTHER SECURITY MEASURES INCL SECURITY PERSONNEL/INSURANCES TAKEN BY OWNERS
   FOR TRANSIT FM PG TO EAST/SOUTH AFRICA OWNERS TO PROVIDE VOUCHERS/INVOICES FOR ALL
   THE EXPENSES TO CH RTRS WHEN CHARGING IN THE HIRE PAYMENT. IT IS FURTHER UNDERSTOOD
   THAT CHARTERERS HAVE OPTION TO SAIL THE MOST DIRECT ROUTE WHEN EMPLOYING ARMED GUARDS

13.JOINT ON/OFF HIRE BUNKER AND CONDITION SURVEY TO BE CARRIED OUT. ON HIRE SURVERY TIME TO BE OWNERS' ACCOUNT WHICH TO BE CARRIED AT DELIVERY PORT OR FIRST PORT OF LOADING. OFF HIRE SURVEY TIME TO BE CHARTERERS' ACCOUNT.
   COST OF ON/OFF HIRE SURVEY TO BE SHARED 50:50 BETWEEN OWNERS AND CHARTERERS.

14.CHTRS TO GIVE OWNERS 30/20/15/10 DAYS APPROXIMATE AND 7/5/3/2/1 DAYS DEFINITE NOTICE OF REDELY WITH REDELY PORT.

15.   In the case Original Bill(s) of Lading are not available prior to vessel's arrival at the discharge port, Owners to allow discharge of the cargo against Charterers' Letter of Indemnity basis Owners' PANDI Club standard wording issued on Charterers' letterhead and signed by an authorized officer

of the Charterers only without bank countersignature.
For all steel cargoes, Charterers' Bill(s) of Lading to be issued and Owners to be sent a copy of the
Bill(s) of Lading for review  as soon as possible ,but for 1st trip only.

16. GA/ARBITRATION IN LONDON WITH ENGLISH LAW TO APPLY

17. BIMCO STANDARD "ISPS" CLAUSE TO BE INCORPORATED INTO C/P

18. BIMCO STANDARD "ISPS" CLAUSE TO BE INCORPORATED INTO C/P

18. CONWARTIME 2013 TO BE INCORPORATED INTO C/P

19. BIMCO BUNKER FUEL SULPHUR CONTENT CLAUSE FOR TIME C/P 2005 TO APPLY - DELE ,RVRTING WITH CP COMMENTS

20. BIMCO OIL POLLUTION CLAUSE TO BE INCORPORATED IN THIS C/P.

21. ALL CARGO DAMAGE CLAIM  - as per ows profoma cp cl 27

22. BIMCO Piracy Clause for Time Charter Parties 2013 TO BE INCORPORATED IN THIS C/P.

23. ASIAN GYPSY MOTH CLAUSE   - as per ows profoma cp cl 64

24. Termination due to Insolvency :
Should the charterer cease to do business in the normal couse, go into liquidation, whether voluntary or
compulsorily, be declared insolvent or bankrupt,
or have a receiver/liquidator appointed, owner shall have the option to terminate the charter and
redeliver the vessel at the nearest safe port, provided vsl is empty of cargo at that time .

25. Stevedore Damage Clause : - as per ows profoma cp cl 35

26 .STEEL LOADING CLAUSE

IF STEEL COILS LOADED, OWNERS WILL ALLOW CHARTERERS TO LOAD STEEL COILS IN ACCORDANCE WITH VESSEL'S
LOADING MANUAL, WITHIN VESSEL PERMISSIBLE TANKTOP STRENGTHS UPTO VESSEL' FULL DEADWEIGHT CAPACITY ALWAYS
SUBJECT TO MASTER'S AND SURVEYOR'S SUPERVISION, SATISFACTION AND AGREEMENT WHICH NOT TO BE UNREASONABLY
WITHHELD THAT IS IT SAFE AND POSSIBLE TO DO SO. CALCULATION BASED ON THE DISTRIBUTION PRESSURE ON TANKTOP
PLATE.

CHTRS ARE TO SUPPLY AT THEIR TIME AND EXPENSE DUNNAGE OF 3-5CM X 8CM THICKNESS,   5 ROWS ON TANKTOP
PRIOR TO LOADING MAX 2 TIERS OF 25 MT COILS. IF STEEL COIL WEIGHT LESS THAN 25 TONS PER UNIT, CHTRS CAN
STACK STEEL COILS WITH EQUIVALENT WEIGHTS AS 2 TIERS OF 25 TONS COIL.

THE PRE-LOADING SURVEY WILL BE ARRANGED /NOMINATED BY OWRS P & I CLUB. JOINT PNI STEEL PRODUCT PRE-
LOADING SURVEY TO BE DONE AND COST TO BE SHARED BETWEEN CHTRS AND OWNERS. OWRS WL ADV THE SURVEYOR FULL
STYLE ONCE CHTRS CONFIRM BY RTN.

OWNERS WILL HAVE OWN SURVEYOR PRESENT FOR PRE LOADING AND DURING THE LOADING OPERATIONS. OWNERS ALSO MAY
APPOINT SOMEONE AT EACH DISPORT.

OTHERWISE AS PER C/P STEEL COILS CL.

27 .ADCOM   3.75 PCT + 1.25 PCT BROKERAGE FM OWRS

28. OTHERS AS PER OWR'S PFMA CP AS ATTACHED WITH LOGICAL AMENDMENTS   AND /OR IN ACCORDANCE WITH MAIN
TERMS AGREED, EXCEPT FLLOWINGS:

mainbody,
line76, delete "No Gulf of Aden trading"
rider clause
clause 47,   delete"steel coils" and  delete "**sulphur, Sulphur**,"

4

para4,   line1, replace " 1 cargo " with" 2 cargo"
para6, delete" scrap not to be last cargo prior redelivery and.... basis"
add  " chtrs shall make vessel' s holds tb grain clean standard, in accordance with relevant local
independent surveyors'  satisfaction before redelivery " at last of para
clause 98,   2nd para replace " prior to vessel sailing load port " with " as soon as possible , but for
1st trip only "
addtional clause:"Fumigation certificate to be provided by charterers before the vsl arrive the first
discharging port. Dunnage and fumigation must in strict conformity with local regulations ."
// END   //


trust above recap is in accordance with yr notes, should you notice any errors or omissions please
advise in writing by return as otherwise shall assume same is in good order.


    Thanks & Best Regards

Bromar Handy/Handymax Team

Steve, Liang HaiHao
Fax:86-21-36328173
 ír: 86-21-36328195
Mob: 86+ 13818059816
MSN   Liangsteve@hotmail.com
SKYPE: lianghaihao

Code Name: "NYPE 93"
Recommended by:
The Baltic and International Maritime Council (BIMCO)
The Federation of National Associations of
Ship Brokers and Agents (FONASBA)

# TIME CHARTER

New York Produce Exchange Form
*Issued by the Association of Ship Brokers and Agents (U.S.A.), Inc.*

November  6th, 1913 - Amended  October 20th, 1921; August 6th, 1931; October 3rd, 1946;
Revised June 12th, 1981; September 14th, 1993.

| | |
|---|---|
| THIS CHARTER PARTY, made and concluded in *Fort Lee, New Jersey,* ........................................... | 1 |
| this..........*7th* .............................. day of *July 2010,*........................... 19 .............. | 2 |
| Between           *Crowned           Eagle           Shipping           LLC,           Marshall Islands,*........................................................... | 3 |
| .................................................................................................................... | 4 |
| *Owners* of the Vessel described below, and *Global Maritime Investments Ltd., Cayman Islands,* | 5 |
| .................................................................................................................... | 6 |
| .................................................................................................................... | 7 |
| *Charterers* | 8 |

Description of Vessel

| | |
|---|---|
| Name        "Crowned        Eagle"        -        see        Description        Clause        46................. | 10 |
| Flag.................Built.........................(year). | 11 |
| Port and number of Registry        ........................................................................ | 11 |
| Classed.....................................in..................................................... | 12 |
| Deadweight.................................................long*/metric* tons (cargo and bunkers, including freshwater and | 13 |
| stores not exceeding........................long/metric tons) on a salt water draft of ............................ | 14 |
| on summer freeboard. | 15 |
| Capacity.................................cubic feet grain.............................................cubic feet bale space. | 16 |
| Tonnage...................................GT/GRT. | 17 |
| Speed about............knots, fully laden, in good weather conditions up to an including maximum | 18 |
| Force...............on the Beaufort wind scale, on a consumption of about.....................long*/metric* | 19 |
| tons of............................. | 20 |
| *Delete as appropriate. | 21 |
| For further description see Appendix "A" (if applicable) | 22 |

| | | |
|---|---|---|
| 1. | Duration | 23 |

| | |
|---|---|
| The Owners agree to let and the Charterers agree to hire the Vessel from the time of delivery for a period | 24 |
| of *minimum 11 months to about 13 months time charter, with "about" meaning plus or minus 15 days* | 25 |
| in *Charterers' option, via safe port(s), safe berth(s), safe anchorage(s), always afloat, always accessible,* | 26 |
| *always within Institute Warranty Limits except NAABSA allowed as per NYPE Clause 6  vessel not to follow ice breakers or force ice,* within below mentioned trading limits. | 27 |
| | 28 |

| | | |
|---|---|---|
| 2. | Delivery | 29 |

| | |
|---|---|
| The Vessel shall be placed at the disposal of the Charterers at *on dropping last outbound sea pilot one* | 30 |

| | |
|---|---|
| *safe port India any time day or night, Sundays and holidays included, intention Mumbai without* | 31 |
| *guarantee*............................................................................................................ | 32 |
| . | |
| .................................................................................... The Vessel on her *arrival first load* | 33 |
| *port*/delivery | |
| shall be ready to receive cargo with clean-swept, *washed down and dried up* holds and tight, staunch, strong | 34 |
| and in every way fitted | |
| for ordinary cargo service, having water ballast and with sufficient power to operate all cargo-handling gear | 35 |
| simultaneously. *See also Clause 68.* | 36 |
| | |
| The Owners shall give the Charterers *first notice of delivery upon clean fixing, then daily notices of* | 37 |
| *delivery.* ~~not less than ..............days notice of expected date of delivery.~~ | 38 |

**3.** **On-Off Hire Survey**     39

*Charterers to appoint a mutually agreed independent surveyor acting on their behalf for performing a*
*joint on- and off-hire bunker and/or condition survey. Joint on-hire survey to be in Owners' time and*
*joint off-hire survey to be in Charterers' time. Expenses to be shared equally.*

| | |
|---|---|
| ~~Prior to delivery and redelivery the parties shall, unless otherwise agreed, each appoint surveyors, for their~~ | 40 |
| ~~respective accounts, who shall not later than at first loading/last discharging port, respectively, conduct~~ | 41 |
| ~~joint on-hire/off-hire surveys, for the purpose of ascertaining quantity of bunkers on board and the condition~~ | 42 |
| ~~of the Vessel. A single report shall be prepared on each occasion and signed by each surveyor, without~~ | 43 |
| ~~prejudice to his right to file a separate report setting forth items upon which the surveyors cannot agree.~~ | 44 |
| ~~If either party fails to have a representative attend the survey and sign the joint survey report, such party~~ | 45 |
| ~~shall nevertheless be bound for all purposes by the findings in any report prepared by the other party.~~ | 46 |
| ~~On hire survey shall be on Charterers' time and off hire survey on Owners' time.~~ | 47 |

**4.** **Dangerous Cargo/Cargo Exclusions**     48

| | |
|---|---|
| (a) The Vessel shall be employed in carrying lawful merchandise excluding *those cargoes as described in* | 49 |
| *Clause 47.* ~~any goods of a dangerous,~~ | |
| ~~injurious, flammable or corrosive nature unless carried in accordance with the requirements or~~ | 50 |
| ~~recommendations of the competent authorities of the country of the Vessel's registry and of ports of~~ | 51 |
| ~~shipment and discharge and of any intermediate countries or ports through whose waters the Vessel must~~ | 52 |
| ~~pass. Without prejudice to the generality of the foregoing, in addition the following are specifically~~ | 53 |
| ~~excluded: livestock of any description, arms, ammunition, explosives, nuclear and radioactive materials,~~ | 54 |
| *See*                              *Clause*                        *47.* | 55 |
| ......................................................................................................... | |
| ...... | 56 |
| ......................................................................................................... | |
| ...... | 57 |
| ......................................................................................................... | |
| ...... | 58 |
| ......................................................................................................... | |
| ...... | 59 |
| ......................................................................................................... | |
| ...... | 60 |
| ......................................................................................................... | |
| ...... | 61 |
| ......................................................................................................... | |
| ...... | 62 |

.................................................................................................................................................... 63
......
.................................................................................................................................................... 64
......
~~(b)  If IMO-classed cargo is agreed to be carried, the amount of such cargo shall be limited to~~ 65
~~............................ tons and the Charterers shall provide the Master with any evidence he may~~ 66
~~reasonably require to show that the cargo is packaged, labelled, loaded and stowed in accordance with IMO~~ 67
~~regulations, failing which the Master is entitled to refuse such cargo or, if already loaded, to unload it at~~ 68
~~the Charterers' risk and expense.~~ 69

5.    **Trading Limits** 70

The  Vessel  shall be employed in such lawful trades between safe ports and safe places 71
within *world-wide trading always afloat, always via safe berth(s), safe port(s), safe anchorage(s),* 72
*always within Institute Warranty Limits and always* excluding *the following countries: Albania, CIS* 73
*Pacific, Cuba, Venezuela, Turkish-occupied Cyprus, Eritrea, Ethiopia, Haiti, Iran, Iraq, Kampuchea,* 74
*Lebanon, Liberia, Libya, Myanmar, North Korea, Sierra Leone, Somalia, Syria, the area 28 deg N to 36*
*deg north and 34 deg to 36 deg east, Djibouti, Kenya, Nigeria, Namibia but Walvis Bay allowed,*
*Oman,*
*Yemen, former Yugoslavia except Slovenia and Croatia, Zimbabwe, and all war and/or piracy risk/like* 75
*areas and areas of hostility and countries/areas/individuals excluded by UN and/or USA.*
*Cargoes destined for Iraq permitted provided UN and/or USA authorized and approved. It is* 76
*Charterers' responsibility to arrange all required documentation in this regard and a copy of same to*
*be furnished to the Master prior to sailing loading port. All costs/time associated with the*
*furnishment of the necessary documents and also with fulfilling the required procedures to be for*
*Charterers' account.*
*No Gulf of Aden trading.*
*Charterers are not permitted to load any cargo breaching UN and/or USA embargoes. Vessel not to*
*trade directly between China and Taiwan.*
*Cuba permitted provided under US licensed cargoes.*
*All required licences and documentation to be furnished to the vessel prior loading.*
*Syria permitted provided restrictions by US Government are lifted. ~~as the Charterers shall direct.~~*

6.    **Owners to Provide** 77

The Owners shall provide and pay for the insurance of the Vessel, except as otherwise provided, and for 78
all provisions, *fresh water, drinking water, lubricating oil,* cabin, deck, engine-room and other necessary 79
stores, including boiler water, shall pay for
wages,  consular  shipping  and  discharging  fees  of the crew and charges for port services pertaining to 80
the
crew; shall maintain the Vessel's class and keep her in a thoroughly efficient state in hull, machinery and 81
equipment for and during the service, and have a full complement of officers and crew. *See Clause 66.* 82

7.    **Charterers to Provide** 83

The Charterers, while the Vessel is on hire, shall provide and pay for all the bunkers except as otherwise 84
agreed; shall pay for port charges (including compulsory watchmen and cargo watchmen and compulsory 85
garbage disposal), ~~all communication expenses pertaining to the Charterers' business at cost,~~ *compulsory* 86
*and*
*customary* pilotages, *however pilotage in Amazon River only if compulsory and cost of pilotage in*
*Dardanelles if needed to be  for Charterers acct,*
towages, agencies, commissions, consular charges (except those pertaining to individual crew members 87
or flag of the Vessel), and all other ususal expenses except those stated in Clause 6, but when the Vessel 88
puts into a port for causes for which the Vessel is responsible (other than by stress of weather), then all 89

|  |  |
|---|---|
| such charges incurred shall be paid by the Owners.  Fumigations ordered because of illness of the crew | 90 |
| shall be for the Owners' account.  Fumigations ordered because of cargoes carried or ports visited while | 91 |
| the Vessel is employed under this Charter Party shall be for the Charterers' account.  ~~All other fumigations~~ | 92 |
| ~~shall be for the Charterers' account after the Vessel has been on charter for a continuous period of six~~ | 93 |
| ~~months or more.~~ *See Clause 51 - Deratting Certificate.* | 94 |

The  Charterers  shall  provide  and pay for  necessary  dunnage  and also any extra  fittings  requisite for a   95
special  trade  or unusual  cargo,  but the  Owners  shall  allow  them  the  use of any  dunnage *and other*   96
*equipment*
already aboard
the Vessel. Prior to redelivery the Charterers shall remove their dunnage and fittings *if requested by*   97
*Owners*
at their cost and in
their  time. *The foregoing  is  subject  to  vessel/cargo  trading  exclusions  and  bulk  carrier  fitness*   98
*certificate*
*and cargo securing manual.*

| **J.** | **Performance of Voyages** | 99 |
|---|---|---|

(a)    The Master shall perform the voyages with due despatch, and shall render all customary assistance   100
with the Vessel's crew. The Master shall be conversant with the English language and (although   101
appointed by the Owners) shall be under the orders and directions of the Charterers as regards   102
employment and agency; and the Charterers shall perform all cargo handling, including but not limited to   103
loading, stowing, trimming, lashing, securing, dunnaging, unlashing, discharging and tallying at their risk   104
and expense, under the supervision of the Master.   105

(b)    If the Charterers shall have reasonable cause to be dissatisfied with the conduct of the Master or   106
officers, the Owners, shall, on receiving particulars of the complaint, investigate the same, and if   107
necessary, make a change in the appointments.   108

| **9.** | **Bunkers** | 109 |
|---|---|---|

*Bunkers on delivery about 1600-1700 MT IFO plus about 70-80 MT MDO.*
*Bunkers on redelivery to be about same as on delivery.*
*Bunker prices both ends: USD 478.00 per metric ton IFO and USD 700.00 per metric ton MDO.*

*Value of bunkers to be paid on delivery together with first hire payment.*

*Charterers  have  the  option  to  deduct  value  of  bunkers  on  redelivery  from  last  sufficient  hire*
*payment.*

*Charterers/Owners to have the privilege to bunker the vessel prior delivery/redelivery provided same*
*does not interfere with vessel/cargo operations.*

*Charterers to have the option to bunker with RMF 180 in South Africa.*

|  |  |
|---|---|
| ~~(a)    The Charterers on delivery, and the Owners on redelivery, shall take over and pay for all fuel and~~ | 110 |
| ~~diesel oil remaining on board the Vessel as hereunder.   The Vessel shall be delivered with:~~ | 111 |
| ~~..........................long*/metric* tons of fuel oil at the price of.........................per ton;~~ | 112 |
| ~~................................tons of diesel oil at the price of...............................per ton. The Vessel~~ | 113 |
| ~~shall~~ | |
| ~~be redelivered with: ...............................tons of fuel oil at the price of.......................per ton;~~ | 114 |
| ~~.....................tons of diesel oil at the price of.........................per ton.~~ | 115 |

*\* Same tons apply throughout this clause.*                                                          116

(b)      The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and     117
auxiliaries and which conform to the specification(s) as set out in ~~Appendix A~~ *Clause 46 and which meet*   118
*applicable regulations for ports visited and areas transited.*
The Owners reserve their right to make a claim against the Charterers for any damage to the main engines     119
or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed     120
specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed     121
specification(s) or otherwise prove unsuitable for burning in the Vessel's engines or auxiliaries, the Owners     122
shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker     123
consumption, nor for any time lost and any other consequences.     124

**10.      Rate of Hire/Redelivery Areas and Notices**                                               125

~~The Charterers shall pay for the use and hire of the said Vessel at the rate of  $..........................................~~     126
~~U.S. currency, daily, or $...........................................U.S. currency per ton on the Vessel's total deadweight~~     127
~~carrying capacity, including bunkers and stores, on....................................summer freeboard, per 30 days,~~     128
 *Hire to be per day, pro rata, including overtime payable every 15 days in advance*

        46.

*First hire payment to be made within 3 banking days after vessel's delivery together with the value of*
*bunkers on delivery,*
commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part     129
of a *day* ~~month~~; hire shall continue until the hour of the day of her redelivery in like good order and condition,     130
ordinary wear and tear excepted, to the Owners (unless Vessel lost) at *on dropping last outbound sea*     131
*pilot*
*one safe port within PMO-Japan range including Malaysia, Thailand, South Korea, The People's*     132
*Republic*
*of China, Vietnam, Taiwan, Indonesia, Philippines, any time day or night, Sundays and holidays*
*included,*                                                                                            133

*or in Charterers' option*

*dropping last outbound sea pilot one safe port within Australia/New Zealand range any time day or*
*night, Sundays and holidays included,*

*or in Charterers' option*

*dropping last outbound sea pilot one safe port within Skaw-Passero / Full Mediterranean - Black Sea range, including United Kingdom, Eire, any time day or night, Sundays and holidays included,*

*or in Charterers' option*

*dropping last outbound sea pilot one safe port within Vancouver-Panama range any time day or night,*
*Sundays and holidays included,*

*or in Charterers' option*

*dropping last outbound sea pilot one safe port within Boston/Buenos Aires range any time day or night,*
*Sundays and holidays included,*

*or in Charterers' option*

*dropping last outbound sea pilot one safe port within Gibraltar/Durban range any time day or night,*
*Sundays and holidays included,* unless otherwise mutually agreed.                                    134

The Charterers shall give the Owners not less than **25/15/10/7** days *approximate* notice *with probable*    135
*port/country followed by 5/4/3/2/1 days definite notices of redelivery* of the Vessel's
expected date and ~~probable~~ *definite* port of redelivery.                                            136

For the purpose hire calculations, the times of delivery, redelivery or termination of charter shall be    137
adjusted to GMT.                                                                                        138

**11.   Hire Payment**                                                                                  139

(a)   *Payment*                                                                                         140

Payment of hire shall be made *to Owners' nominated bank* so as to be received by the Owners or their    141
designated payee ~~in~~
viz *remit by wire to MT103 direct to SWIFT Code as nominated by Owners:*                                142
..............................................................................................................................    143
..............................................................................................................................    144
......
..............................................................................................................................    145
...~~in~~
...............................................................................~~currency, or~~ in United States Currency, in funds available to    146
the
Owners on the due date, 15 days in advance, and for the last month or part of same the approximate        147
amount of hire, and should same not cover the actual time, hire shall be paid for the balance day by day    148
as it becomes due, if so required by the Owners. Failing the punctual and regular payment of the hire,      149
or on any fundamental breach whatsoever of this Charter Party, the Owners shall be at liberty to           150
withdraw the Vessel from the service of the Charterers without prejudice to any claims they (the Owners)    151
may otherwise have on the Charterers.                                                                   152

*First hire and value of bunkers on delivery to be paid within 3 (three) banking days after vessel's*
*delivery*
*and Charterers' receipt of relevant invoice by fax or email.*

*Hire and all monies due to the Owners under this Charter Party will be paid to Owners' bank as*
*stated*

054

*above. Charterers will not agree to the assignment of hire, monies due under this Charter Party nor the*
*Charter Party itself in any circumstances whatsoever.*

| | |
|---|---|
| At any time after the expiry of the grace period provided in Sub-clause 11 (b) hereunder and while the | 153 |
| hire is outstanding, the Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold | 154 |
| the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever | 155 |
| for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and hire | 156 |
| shall continue to accrue and any extra expenses resulting from such withholding shall be for the | 157 |
| Charterers' account. | 158 |

(b)     <u>Grace Period</u>                                                                                                   159

Where there is failure to make punctual and regular payment of hire and/or bunker due to oversight, negligence, errors                                                                                                          160
or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners       161
*3 (three)*............. clear banking days (as recognized at the agreed place of payment) written notice to rectify  162
· ne
failure, and when so rectified within those *3 (three)*........... days following the Owners' notice, the payment shall      163
stand as regular and punctual.                                                                                     164

Failure by the Charterers to pay the hire within *3 (three)*............... days of their receiving the Owners' notice as      165
provided herein, shall entitle the Owners to withdraw as set forth in Sub-clause 11 (a) above.                     166

(c)     <u>Last Hire Payment</u>                                                                                              187

~~Should the vessel be on her voyage towards port of redelivery at the time the last and/or the penultimate~~      168
~~payment of hire is/are due, said payment(s) is/are to be made for such length of time as the Owners and~~        169
~~the Charterers may agree upon as being the estimated time necessary to complete the voyage, and taking~~         170
~~into account bunkers actually on board, to be taken over by the Owners and estimated disbursements for~~         171
~~the Owners' account before redelivery. Should same not cover the actual time, hire is to be paid for the~~       172
~~balance, day by day, as it becomes due. When the Vessel has been redelivered, any difference is to be~~          173
~~refunded by the Owners or paid by the Charterers, as the case may be.~~                                          174

.(d)     <u>Cash Advances</u>                                                                                                175

~~Cash for the Vessel's ordinary disbursements at any port may be advanced by the Charterers, as required~~        176
~~by the Owners, subject to a 2½ percent commission and such advances shall be deducted from the hire.~~           177
~~The Charterers, however, shall in no way be responsible for the application of such advances.~~                  178
*Owners will appoint directly their own agent to handle any Owners' items.*

**12.     Berths**                                                                                                          179

The Vessel shall be loaded and discharged in any safe dock or at any safe berth or safe place that               180
Charterers or their agents may direct, provided the Vessel can safely enter, lie and depart always afloat        181
at any time of tide *except NAABSA where it is customary for similar size vessels to safely lie aground.*         182
*See Clause 5.*

**13.     Spaces Available**                                                                                                183

(a) *No cargo to be loaded on decks and hatch covers.* The whole reach of the Vessel's holds, ~~decks~~ and       184
other cargo spaces (not more than she can
reasonably and safely stow and carry), also accommodations for supercargo, if carried, shall be at the           185
Charterers' disposal, reserving only proper and sufficient space for the Vessel's Officers, crew, tackle,        186

apparel, furniture, provisions, stores and fuel.                                                                187

(b)   In the event of deck cargo being carried, the Owners are to be and are hereby indemnified by the          188
Charterers for any loss and/or damage and/or liability of whatsoever nature caused to the Vessel as             189
result of the carriage of deck cargo and which would not have arisen had deck cargo not been loaded.            190

**14.     Supercargo and Meals**                                                                                191

The Charterers are entitled to appoint a supercargo, who shall accompany the Vessel at the Charterers'          192
risk, *Charterers' supercargo, before boarding vessel, to sign Owners' ISM Letter of Indemnity form* and       193
see that voyages are performed with due despatch. He is to be furnished with free
accommodation and same fare as provided for the Master's table, the Charterers paying at the rate of           194
*USD 10.00.............................* per day. The Owners shall victual pilots and customs officers, and also, when   195
authorized by the Charterers or their agents, shall victual tally clerks, stevedore's foreman, etc.,           196
Charterers paying at the rate of *USD 1,250.00 per month or pro rata for all victualling, gratuities and cost*   197
*of cables.* per meal for all such victualling.

**15.     Sailing Orders and Logs**                                                                             198

The Charterers shall furnish the Master from time to time with all requisite instructions and sailing          199
directions, in writing, in the English language, and the Master shall keep full and correct deck and engine    200
logs of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the       201
Charterers, their agents or supercargo, when required, with a true copy of such deck and engine logs,          202
showing the course of the Vessel, distance run and the consumption of bunkers. Any log extracts               203
required by the Charterers shall be in the English language.                                                    204

**16.     Delivery/Cancelling**                                                                                 205

If required by the Charterers, time shall not commence before *0001 hours local time July 15, 2010,* and should the   206
Vessel not be ready for delivery on or before *July 25, 2010,* but not later than *2359..........hours local time,*   207
the Charterers shall have the option of cancelling this Charter Party.                                          208
*Vessel's Itinerary: ETA Mumbai July 13, 2010, all going well, weather permitting, without guarantee.*
*                   ETCD Mumbai July 20, 2010, all going well, weather permitting, without guarantee.*

    *Extension of Cancelling*                                                               209

If the Owners warrant that, despite the exercise of due diligence by them, the Vessel will not be ready         210
for delivery by the cancelling date, and provided the Owners are able to state with reasonable certainty        211
the date on which the Vessel will be ready, they may, at the earliest seven days before the Vessel is           212
expected to sail for the port or place of delivery, require the Charterers to declare whether or not they will   213
cancel the Charter Party. Should the Charterers elect not to cancel, or should they fail to reply within two     214
days or by the cancelling day, whichever shall first occur, then the seventh day after the expected date         215
of readiness for delivery as notified by the Owners shall replace the original cancelling date. Should the       216
Vessel be further delayed, the Owners shall be entitled to require further declarations of the Charterers        217
in accordance with this Clause.                                                                                 218

**17.     Off Hire**                                                                                            219

In the event of loss of time from deficiency and/or default and/or strike of Officers or crew, or deficiency    220
of stores, fire, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the          221
arrest of the Vessel, (unless such arrest is caused by events for which the Charterers, their servants,          222
agents or subcontractors are responsible), or detention by average accidents to the Vessel or cargo unless      223

resulting from inherent vice, quality or defect of the cargo, drydocking for the purpose of examination or    224
painting bottom, or by any other similar cause preventing the full working of the Vessel, the payment of    225
hire and overtime, if any, shall cease for the *actual* time thereby lost. Should the Vessel deviate or put back    226
during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident    227
to the cargo or where permitted in lines 257 to 258 hereunder, the hire is to be suspended from the time    228
of her deviating or putting back until she is again in the same or equidistant position from the destination    229
and the voyage resumed therefrom. All bunkers used by the Vessel while off hire shall be for the Owners'    230
account. In the event of the Vessel being driven into port or to anchorage through stress of weather,    231
trading to shallow harbors or to rivers or ports with bars, any detention of the Vessel and/or expenses    232
resulting from such detention shall be for the Charterers' account. If upon the voyage the speed be    233
reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and    234
the cost of any extra bunkers consumed in consequence thereof, and all extra proven expenses may be    235
deducted from the hire.    236

**18.    Sublet**    237

Unless otherwise agreed, the Charterers shall have the liberty to sublet the Vessel for all or any part of    238
.he time covered by this Charter Party, but the Charterers remain responsible for the fulfillment of this    239
Charter Party.    240

**19.    Drydocking**    241

~~The                               Vessel                          was                              last~~    242
~~drydocked..................~~

~~*(a) The Owners shall have the option to place the Vessel in drydock during the currency of this Charter~~    243
~~at a convenient time and place, to be mutually agreed upon between the Owners and the Charterers, for~~    244
~~bottom cleaning and painting and/or repair as required by class or dictated by circumstances.~~    245

*(b)   Except in case of emergency no drydocking shall take place during the currency of this Charter    246
Party.    247

* *Delete as appropriate*    248

**20.    Total Loss**    249

Should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or    250
being last heard of) shall be returned to the Charterers at once.    251

**21.    Exceptions**    252

The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the    253
seas, rivers, machinery, boilers, and navigation, and errors of navigation throughout this Charter, always    254
mutually excepted.    255

**22.    Liberties**    256

The Vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels    257
in distress, and to deviate fo the purpose of saving life and property.    258

**23.    Liens**    259

The Owners shall have a lien upon all cargoes and all sub-freights and/or sub-hire for any amounts due    260
under this Charter Party, including general average contributions, and the Charterers shall have a lien on    261
the Vessel for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be    262
returned at once.    263

| | |
|---|---|
| The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien or encumbrance | 264 |
| which might have priority over the title and interest of the Owners in the Vessel. The Charterers | 265 |
| undertake that during the period of this Charter Party, they will not procure any supplies or necessaries | 266 |
| or services, including any port expenses and bunkers, on the credit of the Owners or in the Owners' time. | 267 |

**24.   Salvage**                                                                                      268

All derelicts and salvage shall be for the Owners' and the Charterers' equal benefit after deducting          269
Owners' and Charterers' expenses and crew's proportion.                                                       270

**25.   General Average**                                                                              271

General average shall be adjusted according to York-Antwerp Rules 1974, as amended 1990,                      272
in *The United Kingdom according to English law* and settled in *United*                                      273
*States* currency.                                                                                            274

The Charterers shall procure that all bills of lading issued during the currency of the Charter Party will     275
contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules      276
1974, as amended 1990, thereof and will include the "New Jason                                                277
Clause" as per Clause 31.                                                                                      278

Time charter hire shall not contribute to general average.                                                     279

**26.   Navigation**                                                                                   280

Nothing herein stated is to be construed as a demise of the Vessel to the Time Charterers.  The Owners         281
shall remain responsible for the navigation of the Vessel, acts of pilots and tug boats, insurance, crew,     282
*and handling of cargo claims (which shall be fully and timely reported by Charterers) on behalf of the*      283
*Owners and the Charterers,* and all other matters, same as when trading for their own account.

**27.   Cargo Claims**                                                                                 284

Cargo claims as between the Owners and the Charterers shall be settled in accordance with the Inter-Club      285
New York Produce Exchange Agreement of February 1970, as amended May, 1984, or any subsequent                 286
modification or replacement thereof.                                                                          287

**28.   Cargo Gear and Lights**                                                                        288

The Owners shall maintain the cargo handling gear of the Vessel which is as follows: *See vessel's*           289
*description*
.......................................................................................................................................................    290
.......................................................................................................................................................    291
.......................................................................................................................................................    292
providing gear (for all derricks or cranes) capable of lifting capacity as described. The Owners shall also   293
provide on the Vessel *sufficient lights* for night work lights as on board, but all additional lights over those on   294
board shall
be at the Charterers' expense.  The Charterers shall have the use of any gear on board the Vessel.  If        295
required by the Charterers, the Vessel shall work night and day and all cargo handling gear shall be at the   296
Charterers' disposal during loading and discharging. In the event of disabled cargo handling gear, or        297
insufficient power to operate the same, the Vessel is to be considered to be off hire to the extent that      298
time is actually lost to the Charterers and the Owners to pay stevedore stand-by charges occasioned          299
thereby, unless such disablement or insufficiency of power is caused by the Charterers' stevedores. If        300
required by the Charterers, the Owners shall bear the cost of hiring shore gear in lieu thereof, in which     301

case the vessel shall remain on hire.                                                                      302

**29.   Crew Overtime**                                                                                   303

~~In lieu of any overtime payments to Officers and crew for work ordered by the Charterers or their agents,~~   304
~~the Charterers shall pay the Owners, concurrently with the hire..............................per month~~       305
~~or pro rata.~~                                                                                            306

**30.   Bills of Lading**                                                                                  307

(a) The Master shall sign the Bills of Lading or Waybills for cargo as presented in conformity with Mate's    308
or Tally Clerk's receipts.  However the Charterers may sign Bills of Lading ~~or Waybills~~ on behalf of the   309
Master, with the Owners' prior written authority, always in conformity with Mate's or Tally Clerk's receipts. 310
*No combined transport, liner or through Bills of Lading are allowed.*
*Seaway Bill only permitted against Owners' prior approval, which not to be unreasonably withheld.*
~~(b) All Bills of Lading or Waybills shall be without prejudice to this Charter Party and the Charterers shall~~   311
~~indemnify the Owners against all consequences or liabilities which may arise from any inconsistency~~            312
~~between this Charter Party and any Bills of Lading or Waybills signed by the Charterers or by the Master~~        313
~~at their request.~~                                                                                      314

~~(c) Bills of Lading covering deck cargo shall be claused: "Shipped on deck at Charterers', Shippers' and~~     315
~~Receivers' risk, expense and responsibility, without liability on the part of the Vessel or her Owners for~~    316
~~any loss, damage, expense or delay howsoever caused."~~                                                   317

*In the case original Bill(s) of Lading are not available at discharging port, Charterers have the*
*option to discharge the entire cargo against presentation of a Letter of Indemnity basis Owners' P &*
*I*
*Club wording, signed by Charterers only.*

**31.   Protective Clauses**                                                                               318

This Charter Party is subject to the following clauses, all of which are also to be included in all Bills of   319
Lading or Waybills issued hereunder:                                                                      320

(a)      CLAUSE PARAMOUNT                                                                                  321
"This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the    322
United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national        323
legislation as may mandatorily apply by virtue of origin or destination of the bills of lading, which shall    324
be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the          325
carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said   326
applicable Act.  If any term of this bill of lading be repugnant to said applicable Act to any extent, such     327
term shall be void to that extent but no further."                                                        328

and                                                                                                       329

(b)      BOTH-TO-BLAME COLLISION CLAUSE                                                                    330
"If the ship comes into collision with another ship as a result of the negligence of the other ship and any    331
act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in    332
the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against       333
all loss or liability to the other or non-carrying ship or her Owners insofar as such loss or liability represents   334
loss of, or damage to, or any claim whatsoever of the Owners of said goods, paid or payable by the other      335
or non-carrying ship or her Owners to the Owners of said goods and set off, recouped or recovered by the       336
other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.           337

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ships or       338
objects, other than or in addition to, the colliding ships or objects are at fault in respect to a collision or     339

contact."                                                                                   340

and                                                                                         341

(c)    NEW JASON CLAUSE                                                                      342
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage   343
resulting from any cause whatsoever, whether due to negligence or not, for which, or for the           344
consequences of which, the carrier is not responsible, by statute, contract or otherwise, the goods,   345
Shippers, Consignees or Owners of the goods shall contribute with the carrier in general average to the  346
payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred,  347
and shall pay salvage and special charges incurred in respect of the goods.                             348

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship   349
or ships belonged to strangers.  Such deposit as the carrier or his agents may deem sufficient to cover   350
the estimated contribution of the goods and any salvage and special charges thereon shall, if required,   351
be made by the goods, Shippers, Consignees or Owners of the goods to the carrier before delivery."       352

and                                                                                         353

(d)    TRADE - DRUG CLAUSE                                                                    354
"In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986 or any re-enactment thereof, the   355
Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested       356
narcotic drugs and marijuana to be loaded or concealed on board the Vessel.                              357

Non-compliance with the provisions of this Clause shall amount to breach of warranty for consequences   358
of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel   359
harmless and shall keep them indemnified against all claims whatsoever which may arise and be made       360
against them individually or jointly.  Furthermore, all time lost and all expenses incurred, including fines,  361
as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account   362
and the Vessel shall remain on hire.                                                         363

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this   364
Clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable   365
time the Vessel is released and at their expense put up the bails to secure release of the Vessel.       366

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the   367
event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the       368
Vessel's personnel."                                                                         369

and                                                                                         370

(e) WAR CLAUSES                                                                              371
"(i) No contraband of war shall be shipped.  The Vessel shall not be required, without the consent of the   372
Owners, which shall not be unreasonably withhold, to enter any port or zone which is involved in a state   373
of war, warlike operations, or hostilities, civil strife, insurrection or piracy whether there be a declaration   374
of war or not, where the Vessel , cargo or crew might reasonably be expected to be subject to capture,   375
seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de   376
facto authority or any purported governmental organization maintaining naval, military or air forces).   377

(ii) If such consent is given by the Owners, the Charterers will pay the provable additional cost of insuring   378
the Vessel against hull war risks in an amount equal to the value under her ordinary hull policy but not   379
exceeding a valuation of...........................................  In addition, the Owners may purchase and the   380
Charterers will pay for war risk insurance on ancillary risks such as loss of hire, freight disbursements,   381
total loss, blocking and trapping, etc.  If such insurance is not obtainable commercially or through a   382
government program, the Vessel shall not be required to enter or remain at any such port or zone.       383

(iii) In the event of the existence of the conditions described in (i) subsequent to the date of this Charter, ~~384~~
or while the Vessel is on hire under this Charter, the Charterers shall, in respect of voyages to any such ~~385~~
port or zone assume the provable additional cost of wages and insurance properly incurred in connection ~~386~~
with Master, Officers and crew as a consequence of such war, warlike operations or hostilities. ~~387~~

(iv) Any war bonus to Officers and crew due to the Vessel's trading or cargo carried shall be for the | 388
Charterers' account." | 389

## 32.  War Cancellation | 390

In the event of the outbreak of war (whether there be a declaration of war or not) between any two or | 391
more  of the following countries: *The United States of America, The United Kingdom, Russia, South* | 392
*Korea,*
*The People's Republic of China, and the vessel's flag state which renders the due fulfilment of this* | 393
*Charter Party impossible, then the Owners and the Charterers together may mutually decide to* | 394
*cancel*
*this Charter Party, whereupon the Charterers shall* ..................................................................... | 395
either the Owners or the Charterers may cancel this Charter Party.  Whereupon, the Charterers shall | 396
redeliver the Vessel to the Owners in accordance with Clause 10; if she has cargo on board, after | 397
discharge thereof at destination, or, if debarred under this Clause from reaching or entering it, at a near | 398
open and safe port as directed by the Owners; or, if she has no cargo on board, at the port at which she | 399
then is; or, if at sea, at a near open and safe port as directed by the Owners. In all cases hire shall | 400
continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of this | 401
Charter Party shall apply until redelivery. | 402

## 33.  Ice | 403

The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area | 404
where lights or lightships have been or are about to be withdrawn by reason of ice, nor where there is | 405
risk that in the ordinary course of things the Vessel will not be able on account of ice to safely enter and | 406
remain in the port or area or to get out after having completed loading or discharging.  ~~Subject to the~~ | 407
~~Owners' prior approval the Vessel is to follow ice-breakers when reasonably required with regard to her~~ | 408
~~size, constructions and ice class.~~ | 409

## 34.  Requisition | 410

Should the Vessel be requisitioned by the government of the Vessel's flag during the period of this Charter | 411
Party, the Vessel shall be deemed to be off hire during the period of such requisition, and any hire paid | 412
by the said government in respect of such requisition shall be retained by the Owners.  The period | 413
during which the Vessel is on requisition to the said government shall count as part of the period provided | 414
for in this Charter Party. | 415

If the period of requisition exceeds *60 (sixty) days* ........................ ~~months~~, either party shall have the option | 416
of cancelling this Charter Party and no consequential claim may be made by either party. | 417

## 35.  Stevedore Damage | 418

Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all | 419
damage to the Vessel caused by stevedores provided the Master has notified the Charterers and/or their | 420
agents in writing as soon as practical but not later than 48 hours after any damage *has occurred.* ~~is~~ | 421
~~discovered.~~  Such
notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent | 422
of  such  damage. *If hidden damage, same to be notified to Charterers latest on completion of* | 423
*discharge.*

(a)  In case of any and all damage(s) affecting the Vessel's seaworthiness and/or the safety of the crew | 424

| | |
|---|---|
| and/or affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs | 425 |
| of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed | 426 |
| and if required passed by the Vessel's classification society. | 427 |

(b) Any and all damage(s) not described under point (a) above shall be repaired at the Charterers' option 428
before or after redelivery concurrently with the Owners' work.  In such case no hire and/or expenses will 429
be paid to the Owners except and insofar as the time and/or the expenses required for the repairs for 430
which the Charterers are responsible, exceed the time and/or expenses necessary to carry out the 431
Owners' work. *Owners always to submit to Charterers original vouchers from repair yard.* 432

**36.  Cleaning of Holds** 433

~~The Charterers shall provide and pay extra for sweeping and/or washing ad/or cleaning of holds between~~ 434
~~voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by~~ 435
~~local regulations at the rate of.................................................................per hold.~~ 436

~~In connection with any such operation, the Owners shall not be responsible if the Vessel's holds are not~~ 437
~~ccepted or passed by the port or any authority.~~  The Charterers shall have the option to re-deliver 438
the Vessel with unclean/unswept holds against a lumpsum payment of...........in lieu of cleaning. *See Clause* 439
*68.* 

**37.  Taxes** 440

~~Charterers to pay all local, state, national taxes and/or dues assessed on the Vessel or the Owners~~ 441
~~resulting from the Charterers' orders herein, whether assessed during or after the currency of this Charter~~ 442
~~Party including any taxes and/or dues on cargo and/or freights and/or hire (excluding~~ 443
~~taxes levied by the country of the flag of the Vessel or the Owners).~~ 444

*All taxes and/or dues on vessel and/or cargo and on Charter hire and freight arising as of cargoes*
*carried or ports visited under this Charter Party shall be for Charterers' account except taxes levied*
*by*
*vessel's flag and in connection with port of vessel's registry, which to be for Owners' account.*

**38.  Charterers' Colors** 445

The Charterers shall have the privilege of flying their own house flag and painting the Vessel with their 446
own markings.  The Vessel shall be repainted in the Owners' colors before termination of the Charter 447
Party.  Cost and time of painting, maintaining and repainting those changes effected by the Charterers 448
shall be for the Charterers' account. 449

**39.  Laid Up Returns** 450

The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their 451
underwriters as and when received from underwriters by reason of the Vessel being in port for a minimum 452
period of 30 days if on full hire for this period or pro rata for the time actually on hire. 453

**40.  Documentation** 454

The Owners shall provide any documentation relating to the Vessel that may be required to permit the 455
Vessel to trade within the agreed trade limits, including, but not limited to, certificates of financial 456
responsibility for oil pollution, provided such oil pollution certificates are obtainable from the Owners' 457
P & I Club, valid international tonnage certificate, Suez and Panama tonnage certificates, valid certificate 458
of registry and certificates relating to the strength and/or serviceability of the Vessel's gear. 459

**41.  Stowaways** 460

(a)     (i)  The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining    461
access to the Vessel by means of secreting away in the goods and/or containers shipped by the    462
Charterers.    463

      (ii)  If, despite the exercise of due care and diligence by the Charterers, stowaways have gained    464
access to the Vessel by means of secreting away in the goods and/or containers shipped by the    465
Charterers, this shall amount to breach of charter for the consequences of which the Charterers    466
shall be liable and shall hold the Owners harmless and shall keep them indemnified against all    467
claims whatsoever which may arise and be made against the.  Furthermore, all time lost and all    468
expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account    469
and the Vessel shall remain on hire.    470

      (iii)  Should the Vessel be arrested as a result of he Charterers' breach of charter  according to    471
sub-clause (a) (ii) above, the Charterers shall take all reasonable steps to secure that, within a    472
reasonable time, the Vessel is released and at their expense put up bail to secure release of the    473
Vessel.

(b)    (i)  If, despite the exercise of due care and diligence by the Owners, stowaways have gained    475
access to the Vessel by means other than secreting away in the goods and/or containers shipped    476
by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including    477
fines, shall be for the Owners' account and the Vessel shall be off hire.    478

      (ii)  Should the Vessel be arrested as a result of stowaways having gained access to the Vessel    479
by means other than secreting away in the goods and/or containers shipped by the Charterers,    480
the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel    481
is released and at their expense put up bail to secure the release of the Vessel.    482

### 42.  Smuggling    483

~~In the event of smuggling by the Master, Officers and/or crew, the Owners shall bear the cost of any~~    484
~~fines, taxes, or imposts levied and the Vessel shall be off hire for any time lost as a result thereof.~~    485
*See Clause 59.*

### 43.  Commissions    486

A commission of *1.25% percent for equal division* is payable by the Vessel and the Owners to    487
*Y.          Clarkson          London,          and          BBT          Tradeships*    488
*LLC*............................................................................................................
..........................................................................................................................    489
..........................................................................................................................    490
on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.    491

### 44.  Address Commission    492

An address commission of *3.75*...................................................percent is payable to *Charterers*..........................    493
..........................................................................................................................    494
.......    495
..........................................................................................................................    496
.......
.................................................................................on hire earned and paid under this Charter.    496

### 45.  Arbitration    497

~~(a)     NEW YORK~~    498
~~All disputes arising out of this contract shall be arbitrated at New York in the following manner, and~~    499

~~subject to U.S. Law:~~                                                                      500

~~One Arbitrator is to be appointed by each of the parties hereto and an third by the two so chosen.  Their~~    501
~~decision or that of any two of them shall be final, and for the purpose of enforcing any award, this~~          502
~~agreement may be made a rule of the court.  The Arbitrators shall be commercial men, conversant with~~         503
~~shipping matters.  Such Arbitration is to be conducted in accordance with the rules of the Society of~~        504
~~Maritime Arbitrators Inc.~~                                                                   505

~~For disputes where the total amount claimed by either party does not exceed US $.........................**~~   506
~~the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society~~     507
~~of Maritime Arbitrators Inc.~~                                                                508

(b)    LONDON                                                                                 509
All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree          510
forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business  511
in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping,           512
one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire.  No            513
award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as          514
above, unless objection to his action be taken before the award is made.  Any dispute arising hereunder        515
shall be governed by English Law.                                                            516

For   disputes   where   the   total   amount   claimed   by   either   party   does   not   exceed   US        517
**$50,000.00...........................**                                                                      
the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime        518
Arbitrators Association.                                                                      519

* Delete para (a) or (b) as appropriate                                                      520

** Where no figure is supplied in the blank space this provision only shall be void but the other provisions   521
of this clause shall have full force and remain in effect.                                   522

If mutually agreed, clauses **46**.......................to **102**................, both inclusive, as attached hereto are fully   523
incorporated in this Charter Party.                                                          524

       **The Charterers**                                    **The Owners**

**BBT Tradeships LLC**

*Rider to M/V "Crowned Eagle" Time Charter dated July 7, 2010*

46.   **Vessel's Description**

| | |
|---|---|
| Vessel: | Crowned Eagle |
| IMO: | 9418729 |
| Yard: | IHI, Japan |
| Built: | November 2008 |
| Flag: | Marshall Islands |
| Class: | NKK |
| Type: | Geared single deck bulk carrier |
| DWAT: | 55,940 MT on 12.735 M SSW, summer TPC 56.94 |
| GRT / NRT: | 31,532 / 18,765 / Panama 26,155 NRT |
| LOA / Beam: | 189.99 M / 32.26 M |
| Grain m3: | 1) 12,060.4 |
| | 2) 15,706.7 |
| | 3) 14,777.2 |
| | 4) 14,770.4 |
| | 5) 14,747.7 |
| Total | 72,062.5 (including hatchways) |
| Bale m3: | 1) 11,042.2 |
| | 2) 14,650.9 |
| | 3) 13,775.4 |
| | 4) 13,812.4 |
| | 5) 13,781.4 |
| Total | 67,062.3 (including hatchways) |

| | |
|---|---|
| Holds /Hatches: | 5 holds suitable for grab discharge / 5 hatches |
| Cranes: | 4 X 30.0 MT SWL (hook mode) / 24.0 MT SWL (grab mode) IHI electro-hydraulic deck cranes, designed and class approved to operate within the designated capacities only |
| Grabs: | 4 x 12.5 m3 Smag-Peiner electro-hydraulic type dual scoop grabs equipped with spill plates for free flowing cargo only |
| Hatch covers: | No. 1) 14.56 M x 18.60 M; No. 2-5) 20.93 M x 18.60 M |
| Speed: | About 14.5 knots ballast on about 31.5 MT IFO, and about 14.0 knots laden on about 31.5 MT IFO, up to Beaufort Force 4/Douglas Sea State 3, provided no negative effects of currents or swells and no hull fouling due to extended stays in port. All figures given basis full sea days only and as an average of all days sea pilot to sea pilot. |
| Consumption: | In Port about 2.7 MT MGO per day idle and about 5.5 MT MGO per day working cranes. |
| | Vessel uses MGO entering / leaving port, when maneuvering and in narrow, shallow or congested waters, rivers, straits, canals, when ballasting / de-ballasting or heating fuel in cold weather. |
| IFO Specification: | RMG 380 ISO 8217:2005 until superseded by new standards. |
| MDO Specification: | DMA 8217:2005 until superseded by new standards. |

Description all "about".

1

## BBT Tradeships LLC

*Rider to M/V "Crowned Eagle" Time Charter dated July 7, 2010*

Charterers:  GMI – Global Maritime Investments Ltd.
Walker House
87 Mary Street
George Town
Grand Cayman
KY1-9002
Cayman Islands

| | |
|---|---|
| Commercial Manager: | Andrew Thompson |
| Direct Telephone: | +44 207 842 4995 |
| Facsimile: | +44 207 023 4829 |
| Mobile: | +44 7798603334 |
| Email: | andrewthompson@m2mship.com |

| | |
|---|---|
| Operations Manager: | Gail Todd |
| | C/O Goulandris Brothers Lts |
| | 34A Queen Anne's Gate |
| | London SW1H 9AB |
| | United Kingdom |

| | |
|---|---|
| Direct Telephone: | +44 207 227 1960 |
| Facsimile: | +44 207 023 4829 |
| Mobile: | +44 7818 060 868 / +44 7713 643 895 |
| Email: | gmiops@goulandbros.co.uk |

Owners:  Crowned Eagle Shipping LLC
**C/O Eagle Shipping International LLC**
477 Madison Avenue
New York NY 10022
USA

| | |
|---|---|
| Operations Director: | Bryan Bittner |
| Direct Office: | 212 785 2500 |
| Mobile: | 914 671 7795 |
| Email: | operations@eagleships.com |
| Website: | www.eagleships.com |

## 47.  Cargo Exclusions

All dangerous, injurious and inflammable or self-combustible cargoes (IMO B cargoes) and the following:

,Acids, alcohol, aggregates. all cargo prohibited under vessel loading manual, aluminum dross, ammonium nitrate, ammonium phosphate, ammonium sulphate, ammunition, arms, black powder, blasting caps and detonator caps, bombs and any kind of explosives, dynamite, TNT, asbestos, asphalt, bagged rice, bitumen, borax, calcium carbide, calcium hypochloride, caustic soda, charcoal, clay, cobblestones permitted with Soft Loading Clause only, containers, copra and by-products, cotton, creosoted goods, direct reduced iron ore, DRI fines, expellers, ferro silicon, harmless or corrosive fertilizers (harmless MAP/DAP/urea, potash permitted), fishmeal, granite blocks, hides, hot briquetted iron ore, HBI fines, Indian coal, industrial chemicals and wastes, iron oxide, livestock, logs, manioc, metallic fines, milled rice, mobile homes, naphtha, nuclear and radioactive goods or wastes of any kind, palm kernel and expellers, petroleum or its by-products, pitch, pond coal, pyrites/pyrite ore, quicklime, radio isotopes, refuse and garbage of any kind, resins, rice bran, river and sea

2

**BBT Tradeships LLC**

*Rider to M/V "Crowned Eagle" Time Charter dated July 7, 2010*

sands, all scraps including motor blocks and turnings (except as per below), silicon manganese, sludge ore, sponge iron, steel coil, sulphur, Sulphur, nitrates, including Chilean nitrates, nickel ore, sunflower seed expellers, tar, tobacco, turpentine, yachts, zinc ashes, any deck cargo and any cargo which exceeds vessel's tank top strength.

*Alumina / Soda Ash / Mineral Sand*
Charterers to have the option to carry alumina, soda ash, mineral sand including Silica sand, during the currency of this charter party provided Owners are not to be responsible for passing hold survey. If vessel fails hold survey, any/all time lost to be for Charterers account and vessel to remain on hire. In addition, any/all extra costs or expenses incurred for cleaning of vessel's holds to be for Charterers account unless same caused by lack of maintenance, in which case same to be for Owner's account.

Soda ash allowed, but not as first cargo and no deductions to be made from hire in respect to vessel cleanliness whatsoever even if caused by previous cargo residues or condition of vessel's holds, including but not limited to proper maintenance.

All cargoes to be loaded and carried according to IMO/US Coast Guard or similar authorities' regulations, including SOLAS, Department of Trade recommendations also to apply.

IMO cargoes of Class 1 + 7 always excluded.

During the Charter, Charterers are allowed to lift 2 (two) total cargoes of the following dirty cargoes. Dirty cargoes shall not be consecutive, neither the last cargo.

*Scrap*
Charterers option to carry up to a maximum of 1 cargo of scrap limited to HMS 1+2 scrap only and always provided same is non oily and excludes motor blocks and turnings. When carrying scrap, the first layers to be gently lowered onto the vessel's tanktops reaching up to 2 meters to provide a proper cushion.  Charterers shall at their time and expense arrange holds survey before loading and after discharging to ascertain damages to holds, if any.

Should electro magnets be used during the loading or discharging, then the risk / time / expense of re-calibrating vessel's compass (if necessary) to be for Charterers account.

Scrap not to be last cargo prior redelivery and not to be carried on a consecutive voyage basis.

*Cement – Cement Clinker*
Charterers option to load maximum 1 cargoes of either Bulk Cement and/or Cement Clinker but not to be consecutive nor consecutive with other dirty cargoes and not to be last cargo prior to redelivery.

1.  Charterers undertake to use holds as little as possible provided vessel's stability, trim and stress permit.

2.  After loading, Charterers undertake to arrange at their expense any special/extra trimming and/or leveling of cargo to Master's satisfaction and also Charterers to give reasonable time to allow for the cargo to settle and any air to escape before vessel's departure from loading berth/port.

**BBT Tradeships LLC**

*Rider to M/V "Crowned Eagle" Time Charter dated July 7, 2010*

3.  Any extra expenses resulting therefrom / incurred thereby and any detention through any of above causes to be for Charterers account.

4.  All cutting and restoring of cement holes to be fully supervised/ attended/ approved by classification surveyor with written documents.

5.  Holes not to be cut within the same frame space with the existing grain feeding holes and to be cut at the suitable place of hatch cover in accordance with vessel's builder's specification.

6.  Welt protection to bilge well of all holds is strictly necessary to keep smooth suction while discharging hold washing water by using gum tapes (plaster) or equivalent.

7.  When restoring cement holes, chill plates or similar material if deemed necessary by Master/surveyor, to be fitted for complete welding in order to reinstate the hatch covers back to their original condition.

8.  After completion of restoring of holes, hose test to be carried out in presence of classification surveyor and the test result should be to his satisfaction. Otherwise the Charterers have the obligation to rectify the situation until and when satisfied by surveyors.

9.  Charterers indemnify Owners of all possible cargo solidification, due to hold sweating which is impossible to avoid by proper operation of existing natural ventilation system.

10. All time for preparing, cutting and restoring up to classification surveyor's satisfaction as well as all expenses including classification surveyor's fees and expenses shall be for Charterers account.

11. Cargo is to be loaded, stowed, carried, and discharged strictly in accordance with applicable national/ international regulations and/or IMO code and recommendations at the Charterers' time, risk and expenses.

12. Charterers to arrange and supply hatch sealing tape at their time and cost and also provide sufficient fresh water for cleaning vessel including accommodation front and decks and also to arrange for removal of residues from holds to masters satisfaction.

13. The Charterers may request the Vessel's crew to perform above services with paying lumpsum US$500 bonus per hold in addition to regular intermediate hold cleaning fee, provided that the Owners and Vessel shall not guarantee that holds will be sufficiently cleaned/accepted at next loading port.

All other cargoes allowed under this Charter Party are allowed consecutive after cement cargoes with Charterers ultimately responsible for cleanliness of holds and subsequent inspections.

*Concentrates*
Concentrates not to be counted as a 'dirty' cargo, i.e., not part of the maximum 2 (two) dirties.

However, it is understood and agreed that Lead Concentrates always to be excluded.

4

## BBT Tradeships LLC

### Rider to M/V "Crowned Eagle" Time Charter dated July 7, 2010

Charterers may carry 2 maximum two cargoes of concentrates; same always to be loaded, stowed and discharged according to IMO and local regulations.

1. Prior to commencement of loading, Charterers/Shippers are to provide laboratory analysis/certificate evidencing that both the flow moisture point and transportable moisture limit of such cargo are within the limit as set out by IMO.

2. Such cargo to be loaded, stowed, trimmed and discharged strictly according to latest IMO and/or any other regulations/rules applicable to such cargo.

3. After loading, Charterers undertake to arrange for special extra trimming and/or leveling of the cargo to satisfaction of Master and independent surveyor appointed by Charterers / Shippers at their expense and time.

4. Any directly related expenses resultant therefrom/incurred thereby (such as hold cleaning to Master's satisfaction/hold survey) and any detention through any of above causes to be for Charterers' account.

### Steel Slabs
Charterers are allowed to load steel slabs (maximum two full cargoes).

1. In the unlikely event of any problems en route to discharged ports that involve the cargo shifting or becoming unsecured or unstable, it is clearly understood that the Master has the right to deviate to a nearby suitable port/place, which he deems appropriate.

2. The cargo is to be properly dunnaged, chocked up, lashed and secured to Master's satisfaction at Charterers' risk and expense. Charterers must supply sufficient dunnage, lashing materials for loading such cargo.

3. If same deemed necessary by Owners, Charterers and/or Shippers and/or Receivers at their expense and time to appoint local surveyor/supercargo at load port who is to give assistance/advice to the Master during loading operation.

4. At discharge, removal of dunnage always to be Charterers responsibility, risk and expense and in accordance with local and international regulations.

5. No California Block Stowage

Charterers to remain responsible for the passing of loading survey(s) as required.

All cargoes to be loaded, stowed, discharged in strict conformity with IMO, BC Code and local regulations. Any extra fittings/equipment/expenses, etc. which are required to observe such regulations to be undertaken by Charterers at their time/expense.

All consumable and standard protective material, fresh water, brushes, ladders, etc., to be arranged and paid for by Charterers.

5

**BBT Tradeships LLC**

*Rider to M/V "Crowned Eagle" Time Charter dated July 7, 2010*

After completion of loading of a "dirty" cargo, all affected/polluted areas/ship's facilities and on completion of discharge, vessel's holds and other ship's facilities affected by the loading thereof, to be thoroughly washed down with fresh water to Master's satisfaction at Charterers' account/time and expense.

<u>Cargo Safety</u>
Unless the cargoes are elsewhere excluded in this agreement, the vessel will load any permitted, lawful, properly certified, safe, cargo which comply with all IMO regulations found in the Code of Safe Practice For Bulk Cargoes (BC Code/International Maritime Solid Bulk Cargoes Code (IMSBC Code as from January 2010) or any similar regulations in effect at the time of loading) and applicable local regulations in effect at the time of loading.

Charterers and/or Shippers shall provide proper and valid certification of all cargoes, including but not limited to cargoes that may liquefy, that complies with all regulations in effect at the time of loading to the Master before loading. The vessel shall have the right to refuse to commence loading if such certification is not provided before loading and the vessel shall remain on hire and will not be responsible for any time lost or cost incurred due to failure to comply with the foregoing.

Notwithstanding any of the certification presented, should it become evident that the certification is questionable or questions about the true condition of the cargo affecting the safety of the vessel arise, the Master and/or Owners may require the cargo to be again certified by a competent authority and/or surveyed before it is loaded by a competent surveyor. Should the survey and/or cargo testing, including a can test regarding liquefaction, find that any of the specifications affecting safety of the vessel to prosecute the intended voyage (such as moisture, density, temperature, etc) are not within acceptable limits, then the cargo will be considered as unlawful and the vessel shall reject that cargo. It is understood and agreed that the vessel will not load until safe cargo is presented. All time, risk and expense for unlawful or unsafe cargoes being presented, including those expenses incurred by Owners regarding surveyors/surveys/cargo testing, shall be for Charterers' account.

48. **War Risk Insurance**
Basic war risk insurance premium for worldwide trading shall be for Owners' account and additional premium for hull and machinery and Officers/crew and crew war bonus, if any, due to vessel's trading to the restricted area shall be for Charterers' account but extra war premium not to exceed London underwriters' minimum scale and Charterers to benefit from Owners' NCB rebate. However, if such insurance is not obtainable commercially or through a government program, the vessel shall not be required to enter or remain at any such port or zone.

Un-amended Conwartime Clause 2004 to be incorporated in this Charter Party:

<u>BIMCO Standard War Risks Clause for Time Charters, 2004</u>
<u>Code Name: "CONWARTIME 2004"</u>

(a) For the purpose of this Clause, the words:

(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) "War Risks" shall include any actual, threatened or reported:

**BBT Tradeships LLC**

*Rider to M/V "Crowned Eagle" Time Charter dated July 7, 2010*

war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b)  The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c)  The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

(d)  (i)  The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(ii)  If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e)  If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f)  The Vessel shall have liberty:-

(i)  to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii)  to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii)  to comply with the terms of any resolution of the Security Council of the United Nations, the

7

**BBT Tradeships LLC**

*Rider to M/V "Crowned Eagle" Time Charter dated July 7, 2010*

effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h) If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

49.  **Panama/Suez Canal Transit**
Owners guarantee that the vessel shall be fully fitted for Panama/Suez Canal transit and in possession of valid certificate during the currency of this Charter to comply with current regulations and requirements of both Canals.

Charterers to render cooperation to Owners for submission of initial transit formalities to the Suez and Panama Canal authorities. Should any discrepancies between tonnage figures described in Canal certificates issued by vessel's classification and by the relevant Canal authorities arise, the latter shall be final and such discrepancies are not considered as misrepresentation.

50.  **Boycott**
If the vessel is boycotted, picketed, blacklisted or if any similar incident occurs at any port or place by shore and/or port laborers and/or tugboats and/or pilots and/or government and/or any authority by reason of the vessel's flag/registry/manning or ownership or terms and conditions on which members of the Officers/crew are employed, or by reason of the vessel's construction and/or her cargo gear and/or her fittings and/or her other equipments, all directly related consequences and any extra expenses reasonably incurred therefrom to be for Owners' account and Charterers are entitled to place the vessel off hire for any time lost by such reason.

51.  **Deratting Certificate**
The vessel shall be delivered with a valid deratting or deratting exemption certificate. If such certificate does not cover the whole period of this Charter, cost of renewal of certificate and any required fumigation for obtaining of such certificate, if necessary, shall be for Owners' account Any detention and extra expenses incurred thereby shall be also for Owners' account.

52.  **Quarantine**
Normal quarantine time and expenses for vessel's entering port shall be for Charterers' account but any time of detention and expenses for quarantine due to pestilence, epidemics and illness of Captain, Officers and crew shall be for Owners' account except where that pestilence, epidemic or illness was contracted at a port or place called whilst under this

8

**BBT Tradeships LLC**

*Rider to M/V "Crowned Eagle" Time Charter dated July 7, 2010*

Charter.

53. **Equipment**

The vessel shall comply with all international and local laws and regulations at any port of call under this Charter Party, including all environmental regulations and Commonwealth of Australia Navigation (Orders) Regulations, in particular but not limited to Marine Orders Part 32 (Cargo Handling Equipment), which governs the vessel's hold and crane ladders as well as ship's cargo-handling equipment, and Marine Order Part 23 (Equipment – Miscellaneous and Safety Measures), which govern gangways and lighting.

The vessel shall also comply with the requirements set out in the amendment to the Code of Safe Practice for Solid Bulk Cargoes (B.C. Code) dated 1996 for the carriage of bulk coal by sea. This is covered by Marine Notice 11/96 (or later revision/amendment) issued by the Australian Maritime Safety Authority (AMSA).

The vessel shall be placed off hire for any time lost during any period(s) when any relevant authority declares the vessel to be in non-compliance with any of the foregoing and any expenses directly attributable thereto, including but not limited to standby of trucks, labor and mechanical equipment, or removal of the vessel from the berth to be for Owners' account. Without prejudice to Clause 15, if the vessel is moved off the berth due to non-compliance with any laws or regulations at any port of call under this Charter Party, the vessel shall remain off-hire for any time lost until the relevant laws or regulations have been complied with and the vessel is in the same position as if there had been compliance originally. Furthermore, the vessel shall be off hire for any time lost by reason of berth congestion or the like that would not have been lost but for the non-compliance. If Charterers should cancel any pre-arranged equipment, there will be occurred some canceling charge but limited to their pre-arranged equipment only.

54. **P & I Club**

Owners guarantee that the vessel shall be fully covered by a P & I Club member of the International Group of P & I Associations. Charterers have the benefit of Owners' P & I Club as far as the rules permit.

55. **Owners' Agents**

Owners to appoint Owners' agents to attend for all Owners' matters such as hospitalization, repatriation of crew, repairs, supply of vessel's stores and provisions, etc. In case Owners are unable to arrange same, Charterers to agree to have their agents attend such matters with Owners paying actual expense.

Charterers' agents are available to perform the following services to Owners: cash advance to the Master by the Owners, crew mail, arranging fresh water supplies, minor medical attendance.

These services to be provided at actual cost and no agency fee is applicable but Owners to settle with agents and to be ultimately responsible for settling same.

56. **Deductions**

Charterers are not entitled to deduct from hire payments any disbursements for Owners' account as owners will appoint and pay agents directly.

57. **Deviation / Put Back**

9

**BBT Tradeships LLC**

*Rider to M/V "Crowned Eagle" Time Charter dated July 7, 2010*

Should the vessel put back whilst on voyage by reason of breakdown of machinery, collision, stranding, fire or the accident or damage to the vessel, or dry-docking or periodical survey, or deviate from the course of the voyage caused by sickness of or accident to the Captain, Officers, crew or any person on board the vessel (other than persons traveling at Charterers' request), or by reason of sending stowaway or refugee, salvage, or by reason of the refusal of the Captain, Officers or crew to do their duties without any specific and valid ground for rejection, or any Owners' matters, the payment of hire shall be suspended from the time of inefficiency in port or at sea until the vessel is again efficient in the same position or regains a point of progress equivalent to that when the hire ceased hereunder. Bunkers consumed while vessel is off-hire and all extra expenses incurred during such period shall be for Owners' account.

58. **Capture, Seizure, Arrest**
Should the vessel be captured or seized or detained or arrested by any authority or by any legal process during the currency of this Charter Party for any reason attributable to the Owners, the payment of hire shall be suspended until the time of her release. Any extra expenses incurred by and/or during such capture or seizure or detention or arrest shall be for Owners' account.

This Clause is inoperable should such capture or seizure or detention or arrest be caused by any reason attributable to the Charterers or their agents or by reason of cargo carried.

59. **Smuggling**
Any delay, expense and/or fines incurred on account of smuggling shall be for Owners' account if caused by the Officers and/or crew or shall be for Charterers ' account if caused by Charterers' supercargo and/or their staff or agents.

60. **Return Premium**
Charterers shall have the benefit of any return insurance premium receivable by Owners from their underwriters, as and when received from the underwriters, by reason of the vessel being in port for a minimum period of 30 days if on full hire for this period or pro rata for the time actually on hire, in which case Charterers to accept speed reductions and/or excessive `consumption, otherwise Charterers to conduct underwater cleaning at their time and expenses. If performance still not improved then Owners to absorb costs to the Charterers of any decrease in speed or increase in consumption.

61. **Hold Condition on Redelivery**
Vessel shall be redelivered by the Charterers to the Owners with clean swept holds. However, Charterers shall have the option to redeliver the vessel with holds as they have been left by stevedores, in consideration of which the Charterers shall pay a lumpsum of USD 5,000.00 excluding removal/disposal of dunnage/lashing materials, if any.

62. **Gangway Watchmen**
Expenses for gangway watchmen if ordered by the vessel to be for Owners' account but if ordered by Charterers or required by port regulations, such expenses shall be for Charterers' account unless required due to nationality of crew or insufficient documentation.

63. **Additional Equipment, Fittings**
Charterers, subject to the Captain's approval which not to be unreasonably withheld, shall be at liberty to fit/weld any additional equipment and fittings for loading, discharging and/or securing cargo. Such work shall be done at the Charterers' expense and time and Charterers shall remove such equipment and fittings at their expense and time prior to redelivery if Owners so request. Alternatively, Owners and Charterers to agree on a reasonable compensation for non-removal of extra fitting.

64. **Gypsy Moth Clause**
The Charterers shall be responsible for the risks associated with and the consequences of

10

**BBT Tradeships LLC**

*Rider to M/V "Crowned Eagle" Time Charter dated July 7, 2010*

trading the Vessel, during the currency of this charter, to ports or places designated by any competent authority as a risk in respect of exposure to contamination by Gypsy Moth larvae/ eggs/ insects or other ("Gypsy Moth Area"). In particular, during the currency of this charter, the Vessel shall remain on hire during any period of delay or detention suffered by the Vessel as a consequence of charterers trading the Vessel to a Gypsy Moth Area.

Charterers shall indemnify and hold harmless Owners in respect of any liabilities, losses, damages or delay which they may sustain within a period of thirty (30) months following redelivery hereunder arising out of or in connection with Charterers trading the Vessel to a Gypsy Moth Area during the currency of the charter.

Owners confirm that on delivery the vessel is free of Gypsy Moth larvae/eggs/insects or other.

65. **Paramount Clause**

Clause Paramount, US Clause Paramount, Canadian Clause Paramount, UK Clause Paramount, BIMCO P & I Bunkering Clause, wherever applicable, shall be deemed to form a part of this Charter Party and shall be contained in all Bill(s) of Lading issued hereunder. Conwartime 2004 War Risk Clause shall also be deemed to form part of this Charter Party. In the event of conflict between Conwartime and BIMCO Piracy Clause, the Piracy Clause shall prevail.

66. **Intermediate Hold Cleaning**

All intermediate hold cleaning during the course of this Charter shall be done at the sole time, risk and expense of the Charterers. However when requested to do so by Charterers, the crew shall render all due assistance in cleaning holds between voyages subject weather, local regulations, trade union labour regulations and time permitting. Any such work is to be carried out as Charterers' servants.

Owners/vessel shall not be responsible for passing subsequent intermediate hold surveys. In addition to bonus paid to the crew for hold cleaning (which Charterers shall arrange directly through Master), Charterers are to pay Owners together with next hire payment USD 600.00 per hold for clean cargoes for crew services, except for dirties which to be paid at rate of USD 1,000.00 per hold unless it is separately described in the protective clause.

It is understood that such assistance in hold cleaning is always only possible provided shore regulations permit. Removal and subsequent disposal of cargo dunnage, separation materials and/ or fittings to be arranged / performed by Charterers' in their time and at their risk and expense. Fresh water and/ or chemicals and equipment (if required) for hold cleaning to be provided and paid for by Charterers

Throughout the currency of this Charter Party and at redelivery, the Charterers shall remain responsible for all costs and time, including deviation, if any, associated with the removal and disposal of cargo-related residues and/or hold washing water and/or chemicals and detergents and/or waste as defined by MARPOL Annex V, Section 1, or other applicable rules relating to the disposal of such substances. Master to use due diligence to insure compliance with MARPOL regulations.

If required by Charterers, the Master, at his discretion which not to be unreasonably withheld, to allow hold washings to be stored in double bottom/ballast tanks for later disposal where

hold cleaning needs to take place in port or between ports where discharge of hold washings would not be possible.

Any delay, costs, consequences or action against Owners/ Vessel arising from cleaning between Australian ports to be entirely at Charterers' risk and expense.

67. **ITF Clause**

11

**BBT Tradeships LLC**

*Rider to M/V "Crowned Eagle" Time Charter dated July 7, 2010*

Owners of the vessel guarantee that the minimum terms and conditions of employment of the crew are now, or will be prior to the presentation of the vessel for loading, and will remain for the period of the Charter Party covered by an ITF agreement or bona fide Trade Union agreement acceptable to the ITF, failing which vessel to be off-hire for any time lost and any extra expense to be for Owners' account.

68.   **Hold Condition on Arrival First Load Port**
On arrival first loading port under this Charter Party, vessel's holds to be clean, swept, dry, free from any previous cargo residue and/or loose rust/rust scales or any other foreign material(s) and ready in all respect in all compartments to load Charterers' intended cargo in accordance with relevant local independent surveyors' satisfaction.

Should the vessel not be clean and ready in every respect, Charterers have the option to put the vessel off hire from time of rejection until vessel again has been accepted. All directly related expenses, including bunkers consumed, are for Owners' account.

If some holds/cargo carrying compartments are not accepted, Charterers shall have the option of accepting the vessel with those which are accepted, and in that case Charterers shall pay hire proportionate to the number of holds/cargo carrying compartments, which have passed survey.

69.   **Adding Off-Hire**
Should the vessel be off-hire for more than 3 (three) consecutive days during the currency of this Charter for any reason whatsoever, the Charterers have the option of adding such agreed off-hire time (except off-hire owing to periodical docking) to the Charter period, which to be declared within 15 days after the occurrence.

70.   **BIMCO Double Banking Clause**
a)   The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transshipment, loading or discharging of cargo and/or bunkering.

b)   The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this Clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

c)   Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do.

d)   The Owners shall be entitled to insure any deductible under the vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the vessel's Underwriters and/or the cost of insuring any deductible under the vessel's hull policy.

e)   The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

71.   **Oil Pollution and Financial Responsibility**

12

**BBT Tradeships LLC**

*Rider to M/V "Crowned Eagle" Time Charter dated July 7, 2010*

1) Owners warrant that during the currency of this Charter Party they will comply fully with any rules and/or regulations presently in force and any legislation enacted with respect to pollution by oil or any other substances (including any rules and/or regulations issued thereunder) issued by any government department or other authorities, and also any similar legislation enforced by any nation of the world, relevant to vessel's actual/required trading under this Charter Party.

2) Owners warrant that throughout the currency of this Charter Party they will provide the vessel with valid Certificates of Financial Responsibility for Oil Pollution issued pursuant to: (1) Sec. 311 (p) of the U.S. Federal Water Pollution Control Act, as amended and (2) any certificates which may be required by U.S. Federal legislation at any time during the currency of this Charter. Should any delay or detention of the vessel occur from failure by Owners to comply with the said acts, laws, rules, regulations or legislations, or failure to hold the relevant certificates, the hire shall cease for the period of such delay or detention, and all extra expenses incurred because of such failure shall be for Owners' account.

72.  **Safety including Drugs and Alcohol**
Owners shall have on board the vessel an effective occupational health and safety policy with the object that due care and attention is given to crewmembers to safe working practices in all operations pertaining to the vessel. The Owners shall have a policy regarding drug and alcohol abuse on board with the object no crewmember will navigate a ship or operate its on-board equipment whilst impaired by drugs or alcohol.

The policy will also have the objective of strictly prohibiting the possession, use, transport and distribution of illicit or non-prescribed drugs by crewmembers. The Owners shall exercise due diligence throughout the period of the Charter Party to ensure that such policies are complied with.

73.  **BIMCO ISM Clause**
From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "THE COMPANY" (as defined by ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "The Company" to comply with the ISM Code shall be for the Owners' account.

74.  Hire to be calculated basis GMT.

75.  **Dunnage Clause**
The Vessel shall be delivered and redelivered free of all dunnage, lining and packing materials.

During the currency of this Charter Party the Charterers shall provide dunnage, lining and packing materials as required at their expense.

The Charterers shall ensure that all dunnage used shall comply with applicable phyto-sanitary regulations.

Throughout the currency of the Charter Party and at redelivery, the Charterers shall remain responsible for all costs and time, including deviation, if any, associated with the removal and disposal of dunnage,

13

**BBT Tradeships LLC**

*Rider to M/V "Crowned Eagle" Time Charter dated July 7, 2010*

lining and packing materials in accordance with MARPOL 73/78 Annex V or any other applicable rules relating to the disposal of such materials.

76.    **Change of Name**
       The vessel shall not change ownership, name, flag, class, technical and/or crew management during the currency of this Charter Party without Charterers' prior approval, which shall not be unreasonably withheld. Charterers are to be given advance notice of any change of Master or Chief Engineer.

77.    **Weather Routing**
       Charterers may employ the services of an independent weather bureau reporting service such as Ocean Routes to route monitor the vessel and the Master is to comply with the reporting procedure. The vessel shall be capable at all times of performing at the agreed speed and consumption in the weather conditions as stated and in the event that this is not the case, then the Charterers shall be compensated for slow speed or over-consumption and shall have the right to deduct this amount from hire. Evidence of the weather conditions to be taken as reported daily on the Noon position report to the Charterers. Douglas Sea State to be defined as per WMO publication No. 8 / The Mariner's Handbook NP 100.

       In case of a discrepancy between the daily noon reports of the Master and the analysis reports of the independent weather bureau reporting service, and a commercial/amicable solution cannot be found, a mutually agreed independent third party to be appointed whose results to be binding. No deductions to be made from hire prior to the decision of the third party.

78.    **Safety Clause for Period Timechartered Vessels**
       Owners acknowledge that Charterers have a policy that requires the highest standards of shipboard operations and agree to cooperate with Charterers in ensuring that all due care and diligence is exercised in regard to:
       The safety of ship, crew and others working with the vessel.
       The environment.
       Cargo care and handling.
       Safe and efficient navigation and
       General housekeeping and management of the vessel.

       Charterers to have the option of inspecting the vessel in relation to the above during this Charter in Charterers' time and at their expense, Owners and Master giving every assistance to Charterers.

       Owners agree that any and all incidents or potential incidents that involve:

       a)  The safety and health of crew and other persons involved with the ship and

       b)  Damage or risk of damages to the environment in any manner

       will be reported to the Charterers as soon as possible after the event.

       It is agreed that such reporting to the Charterers will in no way constitute an admission of liability.

       It is agreed that nothing in this Clause or reporting of incidents thereof will change the respective responsibilities and liabilities of the Charterers and Owners and all other terms and conditions of this Charter Party will apply irrespective of any agreement or action taken pursuant to this Clause.

14

**BBT Tradeships LLC**

*Rider to M/V "Crowned Eagle" Time Charter dated July 7, 2010*

Notwithstanding anything else contained in this Charter Party, all costs or expenses arising out of or related to security regulations or measures required by any country to which the vessel is ordered to sail and/or by the vessel's flag state and/or international organization, including but not limited to additional equipment and personnel on board (such as security officer), security guards, launch services, tug escorts, port security fees or taxes and inspections shall be for Charterers' account unless such costs or expenses result solely from the Owners' negligence.

Bulk Carrier Safety Clause

A) Charterers shall instruct the Terminal Operators or their representatives to cooperate with the Master in completing the *IMO Ship/Shore Safety Checklist* and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

B) In addition to the above and notwithstanding any provision in this Charter Party in respect of loading/discharging rates, Charterers shall instruct the Terminal Operators to load/discharge the vessel in accordance with the loading/discharging plan, which shall be approved by the Master with due regard to the vessel's draught, trim, stability, stress or any other factor which may affect the safety of the vessel.

C) At any time during cargo operations the Master may, if he deems it necessary for reasons of safety of the vessel, instruct the Terminal Operators or their representatives to slow down or stop the loading or discharging.

US Customs Advance Notification/AMS Clause for Time Charter Parties

a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i)   Have in place a SCAC (Standard Carrier Alpha Code);
ii)  Have in place an ICB (International Carrier Bond);
iii) Provide the Owners with a timely confirmation of i) and ii) above;

and

iv)  Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

15

**BBT Tradeships LLC**

*Rider to M/V "Crowned Eagle" Time Charter dated July 7, 2010*

BIMCO ISPS Clause for Time Charter Parties

a)  i)   From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party,
the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company".

Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii)  Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

b.)  (i)  The Charterers shall provide the CSO and the Ship Security Officer (SSO) / Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise pro-vided to the CSO and the SSO / Master.

Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners."

(ii)  Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

c.)   Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

d.)   If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnity the paying party.

79.   *Hamburg Rules Charter Party Clause*
With reference to Clause 8 hereunder, neither the Charterers nor their Agents shall permit the issue of any bill of lading, waybill or other document evidencing a contract of carriage (whether or not signed on behalf of the Owner or on the Charterers' behalf or on behalf of any Sub-Charterers) incorporating, where not compulsorily applicable, the Hamburg Rules or any other legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague/Visby Rules. Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this clause.

16

**BBT Tradeships LLC**

*Rider to M/V "Crowned Eagle" Time Charter dated July 7, 2010*

80. **Steel Pre-Loading Survey**
In case of loading finished steel/steel products, pre-loading cargo survey to be carried out by Owners' P & I Club surveyor and costs to be for Owners' account.

81. Owners have the option to sell the vessel, change the ownership and/or management and/or flag during the currency of the Charter Party, transferring the balance of the Charter to Buyers. Owners unconditionally guarantee such sale or change will not in any way involve changing of the terms and conditions of this Charter Party. Furthermore, such sale or change shall be subject to Charterers' prior consent, which shall not be unreasonably withheld.

Details of the intended new ownership to be given to Charterers with sufficient time to allow a full and complete checking on their background.
Should the intended new ownership/management not meet Charterers' requirements and should Owners continue with such sale or change, then Charterers shall have the option of canceling this Charter Party, reserving Charterers' all claims, rights, under this Charter.

82. Owners guarantee that on delivery, vessel's hatch covers are weather-tight and same to remain throughout this Charter period and if any hatch cover found defective, same to be rectified at Owners' time and expenses to an independent surveyor's satisfaction, unless non-weather-tightness originates from default on the part of the cargo(es) carried and/or Charterers' and/or their servants' default, in which case same to be rectified by Charterers and Owners not to be held responsible for any consequences thereof. Charterers have the right to carry out hose test on any/all hatches at their time and expense at any time during this Charter.

83. Owners guarantee vessel's holds are to be clear of any fittings/superstructures such as car deck, curtain pates, center fitting, whatsoever.

84. Owners warrant that the vessel is suitable for worldwide trading including Australia/New Zealand with AHL/WWF/ITF or equivalent in good order.

85. Vessel is fitted for carriage of grain in accordance with Chapter VI of SOLAS 1974 and amendments without requiring bagging, strapping and securing when loading a full cargo (deadweight) of heavy grain in bulk (stowage factor 42 CUFT) with ends untrimmed.

86. Charterers to have free use of vessel's gears, cranes and grabs, etc., as on board. Owners warrant vessel's grabs to be maintained/operated in good condition during this Charter Party, normal wear and tear excepted, unless any default or malfunction originates from default on the part of the Charterers and/or their servants and/or cargoes handled.

87. Owners warrant tank top is flat/steel-floored and suitable for normal grab load/discharging operations.

88. To the best of the Owners' knowledge and belief, the vessel is not blacklisted by the USCG under either the Paris or Tokyo MOU's or by any labor organization such as ITF and is eligible to trade worldwide in accordance with the trading restrictions in the Charter Party.

89. **Dry Dock**
Dry-docking in case of emergency only.

90. **Bunker Quality Control Clause for Time Chartering**
(1) The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's

17

**BBT Tradeships LLC**

*Rider to M/V "Crowned Eagle" Time Charter dated July 7, 2010*

engines and auxiliaries and which conform to the specification(s) mutually agreed under this Charter.

(2) At the time of delivery of the Vessel the Owners shall place at the disposal of the Charterers, the bunker delivery note(s) and any samples relating to the fuels existing on board.

(3) During the currency of the Charter the Charterers shall ensure that bunker delivery notes are presented to the Vessel on the delivery of fuel(s) and that during bunkering representative samples of the fuel(s) supplied shall be taken at the Vessel's bunkering manifold and sealed in the presence of competent representatives of the Charterers and the Vessel.

(4) The fuel samples shall be retained by the Vessel for 90 (ninety) days after the date of delivery or for whatever period necessary in the case of a prior dispute and any dispute as to whether the bunker fuels conform to the agreed specification(s) shall be settled by analysis of the sample(s) by VISWA LABS whose findings shall be conclusive evidence as to conformity or otherwise with the bunker fuels specification(s).

(5) The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the ship's engines or auxiliaries the Owners shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker consumption nor for any time lost and any other consequences.

91.   Vessel is consigned to Charterers' agents at all ports ad will provide all information requested timely, including ETA / ETD, insofar known, however any filings for places such as Brazil, South Africa and USA which employ an electronic filing arrangement shall be Charterers' responsibility but ENOA in USA always to be Master's / Owners' responsibility.

92.   ***BIMCO Piracy Clause for Time Charter Parties***
(a) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to any actual, threatened or reported acts of piracy, whether such risk of piracy existed at the time of entering into this charter party or occurred thereafter. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(b) If the Owners do not give their consent they shall immediately inform the Charterers and the Charterers shall be obliged to issue alternative voyage orders and any time lost due to compliance with such orders shall not be considered off-hire. The Charterers shall indemnify the Owners for any claims from holders of Bills of Lading or third parties caused by such orders.

(c) If the Owners consent or if the Vessel proceeds to or through an area exposed to risk of piracy the Owners shall have the liberty:

i)   to take reasonable preventive measures to protect the vessel, her crew and cargo including but not limited to taking a reasonable alternative route, proceeding in convoy, using escorts, avoiding day or night navigation, adjusting speed or course, or engaging security personnel or equipment on or about the vessel,

18

**BBT Tradeships LLC**

*Rider to M/V "Crowned Eagle" Time Charter dated July 7, 2010*

ii) to comply with the orders, directions or recommendations of any underwriters who have the authority to give the same under the terms of the insurance;

iii) to comply with all orders, directions, recommendations or advice given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group, including military authorities, whatsoever acting with the power to compel compliance with their orders or directions;

iv) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

and the Charterers shall indemnify the Owners for any claims from holders of Bills of Lading or third parties caused by such orders.

(d) Costs

i) If the Vessel proceeds to or through an area where due to risk of piracy additional costs will be incurred including but not limited to additional insurance, additional personnel and preventative measures to avoid piracy attacks, such costs shall be for the Charterers' account. Any time lost waiting for convoys, following recommended routing, timing, or reducing speed or taking measures to minimise risk, shall be for the Charterers' account and the Vessel shall remain on hire;

ii) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first;

iii) If the underwriters of the Owners' insurances should require payment of additional premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of piracy risks, then the actual additional premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e) If the Vessel is attacked or seized by pirates any time lost shall be for the account of the Charterers and the Vessel shall remain on hire. If the Vessel is seized the Owners shall keep the Charterers closely informed of the efforts made to have the Vessel released.

(f) If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charter Party.

93.   Fumigation of grain or meal cargo in transit permitted at Charterers' risk/time and expense provided that fumigant used is a standard commercially-used product applied by a licensed and bonded fumigator or marine chemist and crew is provided with full instructions, MSDS, and the necessary equipment such as SCBA, gas testing equipment and placards. Marine

19

**BBT Tradeships LLC**

*Rider to M/V "Crowned Eagle" Time Charter dated July 7, 2010*

chemist, if available, to enter vessel's holds to remove fumigant pillows or cachets from the vessel's holds. If marine chemist not available, such operation to be performed by vessel's crew with proper equipment provided by Charterers.

94. Negotiations and fixture, if any, to be kept strictly private and confidential but since Owner is an affiliate of a publicly quoted company, it may be required to disclose the facts of this fixture.

95. In case considering cargo to US Charterers, the attached Marine Safety Advisory from vessel's flag state to apply.

96. Charterers to have the option to use bulldozers in vessel's holds provided not exceeding the tank top strength.

    If required, Stevedores to lift on board, shift from hold to hold, and discharge the bulldozers by use of vessel's gear.

97. **Bottom Fouling Clause**
    In case of bottom fouling due to Charterers ordering the vessel to stay in or off Tropical water port(s)/place(s)/area(s) in excess of 25 days total, Owners not to be responsible for any speed deficiency or over consumption thereafter. In such a case Owners will carry out bottom cleaning at a place to be mutually agreed thereafter in Charterers time and at their expense.

    Charterers agree not to claim for under performance of the vessel due to fouling for the passage from the port in question until underwater scrubbing is carried out. Upon completion of underwater scrubbing, Charter Party warranties apply.

98. **Bills of Lading**
    In the case Original Bill(s) of Lading are not available prior to vessel's arrival at the discharge port, Owners to allow discharge of the cargo against Charterers' Letter of Indemnity basis Owners' PANDI Club standard wording issued on Charterers' letterhead and signed by an authorized officer of the Charterers only without bank countersignature.

    For all steel cargoes, Charterers' Bill(s) of Lading to be issued and Owners to be sent a copy of the Bill(s) of Lading for review prior to vessel sailing load port.

99. **Letter of Indemnity**
    Attached please find pro forma Letter of Indemnity based on Owners' PANDI Club wording for discharging cargo without presentation of original Bills of Lading.

    To ensure timely and smooth cooperation when it becomes necessary to issue this LOI please observe the following guidelines:

    1. The LOI is to be issued under Charterers letterhead with full style consonant with Charterers full style as it appears in the CP, and signed by an authorized corporate officer under official Company seal/stamp.

    2. A copy of all Original Bill(s) of Lading is to accompany the LOI. Duplicate (2nd Original), Triplicate (3rd Original), non-negotiable, unsigned or pro forma Bills will not be accepted. Unless different forms are used a single specimen of the back of one Bill of Lading should be included, unless blank which please indicate in your cover message.

20

### BBT Tradeships LLC

*Rider to M/V "Crowned Eagle" Time Charter dated July 7, 2010*

3. In order to avoid delays or problems arising from late presentation, the LOI and Bills of Lading should be submitted during office hours in NY at least 2 business days prior to arrival in a clear, legible format such as .pdf files.

4. Please proofread the LOI carefully so that it includes the relevant information exactly as stated on the OBL, apparent typo errors on the OBL included.

5. In the cover message please advise who has custody of the Bills of Lading and when they are likely to be presented to the discharge port agents. In order to close out Charterers obligations under the LOI, it is to be exchanged for the OBL's on presentation so Charterers should instruct discharge port agents to advise Owners when this has been accomplished.

6. Lastly, no LOI is to be handed to the Master. All communications regarding the LOI will be handled directly by Owners.

100. *Deleted*

101. *Bunker Fuel Sulphur Content Clause*
   a. Without prejudice to anything else contained in this Charter Party, the Charterers shall pay reasonable expenses if any in readying vessels tanks and supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

   The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

   The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

   b. Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

   (i) The Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

   (ii) The Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

   Subject to having complied with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

   c. For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

21

*BBT Tradeships LLC*

*Rider to M/V "Crowned Eagle" Time Charter dated July 7, 2010*

102.   Trading to any lawfully permitted ports as elsewhere stated in this CP provided that no individual or firm in any way connected with the cargo and/or with any control, property or interest in this transaction or voyages planned whatsoever is listed on any of the following as of the time cargo is loaded or instructions as to a voyage are given:

    a)   US Treasury Department Office of Foreign Asset Control (OFAC) list of "Specially Designated Nationals" (SDN's) found at http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx. as of the date of shipment.
    b)   HM Treasury Financial Services website found at : http://www.hm-treasury.gov.uk/fin_sanctions_index.htm
    c)   European Union External Action website found at : http://eeas.europa.eu/cfsp/sanctions/consol-list_en.htm

Notwithstanding anything else contained in the CP, Charterers shall remain responsible for any and all costs, losses, damages civil and criminal penalties resulting from any breach of this clause.

✿✿✿✿✿✿✿✿✿✿✿✿✿✿✿✿✿✿✿✿✿✿✿

22

# EXHIBIT B

**Pantelis, Pantelis**

**From:** Eagle Operations [mailto:operations@eagleships.com]
**Sent:** Tuesday, June 24, 2014 10:28 PM
**To:** 'renee@bromar.com.cn' <renee@bromar.com.cn>; 'ops@bromar.com.cn' <ops@bromar.com.cn>;
**Cc:** Singapore Operations <sinops@eagleships.com>; Eagle Operations <operations@eagleships.com>; Chen
Chunxiao <cchunxiao@eagleships.com>; Bryan Bittner <bbittner@eagleships.com>; Weller, Charles G.;
AllEagleChartering <AllEagleChartering@eagleships.com>; Alexis Zoullas <azoullas@eagleships.com>; Alla Bolgov
<abolgov@eagleships.com>
**Subject:** OWL V25-01 TC SUNTIME CP 18JUNE2014 .. Owners Chire overdue .. Anti-Tech Notice - Urgent

*TO: Bromar Shipping Ltd! Attn: Renee Liang.  Please pass on to Chtrs*

RE: OWL V25-01 TC SUNTIME CP 18JUNE2014 .. Owners Chire overdue .. Anti-Tech Notice -
Urgent

Ni Hao!

As advised prior  chire  balance was due 23rdth June and  as of COB 24th June still remains unpaid,
Regret but  Owners have to  serve the Anti-Technicality notice.

In accordance with clause 11, payment of hire is to be made to Owners' bank, in funds available on the
due date, in advance.  As the Owners have not received Charterers' payment advice details at all, there is
no credible reason to believe that the Charterers' failure to make punctual and regular payment of hire is
due to any oversight, negligence, errors or omissions on the part of the Charterers or their bankers such
as to entitle the Charterers to 3 (three) clear banking days notice to rectify the failure as provided for in
clause 11(b).

Nonetheless, without prejudice to all their rights, by this message the Owners do hereby give Charterers'
notice pursuant to clause 11(b) of the charter party that the Charterers now have 3 (three) clear banking
days to rectify the failure by making payment of the hire due.   Further take note that if the Charterers fail
to pay the said hire within 3 (three) clear banking days of his notice the Owners shall withdraw the vessel
pursuant to clause 11(a) strictly without prejudice to any claims they may otherwise have against the
Charterers.

Charterers should also take note that, pursuant to the express terms of clause 11(a), at any time after the
expiry of the 3 banking day grace period, and while the hire is still outstanding, the Owners shall,
without prejudice to their right to withdraw, be entitled to withhold the performance of any and all of
their charter party obligations and shall have no responsibility whatsoever for any consequences of that
suspension of the services, and in respect of which the Charterers shall be obliged to indemnify the
Owners, and hire shall continue to accrue and any extra expenses resulting from such withholding shall
be for the Charterers' account.

All Owners rights reserved.

Kindly confirm

Best regards,

Capt.  Kenny  P. D'Silva

Eagle Shipping International (USA) LLC, as agents for Owners

1

093

Tel: 212 785 2500

AOH: 201 387 8193

094

Pantelis, Pantelis

**From:** Eagle Operations [mailto:operations@eagleships.com]
**Sent:** Thursday, June 26, 2014 03:38 AM
**To:** 'renee@bromar.com.cn' <renee@bromar.com.cn>; 'ops@bromar.com.cn' <ops@bromar.com.cn>; 'charteringsuntime@163.com' <charteringsuntime@163.com>; 'jemima.yang@suntimeshipping.com' <jemima.yang@suntimeshipping.com>; 'almeekurt@hotmail.com' <almeekurt@hotmail.com>; 'yangge0411@hotmail.com' <yangge0411@hotmail.com>
**Cc:** Singapore Operations <sihops@eagleships.com>; Chen Chunxiao <cchunxiao@eagleships.com>; Bryan Bittner <bbittner@eagleships.com>; Weller, Charles G.; AllEagleChartering <AllEagleChartering@eagleships.com>; Alexis Zoullas <azoullas@eagleships.com>; Alla Belgov <abelgov@eagleships.com>; Alberto Cruz-Mayor <acruz-mayor@eagleships.com>
**Subject:** "OWL" V25-01 TC DALIAN SUNTIME INTERNATIONAL TRANSPORTATION CO. LTD C/P 18 JUNE 2014 - Anti-Tech Notice - Urgent

TO: Bromar Shipping Ltd] Attn: Renee Liang.  Please pass on to Chtrs

TO: DALIAN SUNTIME INT'L TRANSPORTATION CO., LIMITED.: Jemima Yang / Kiki Du

**"OWL" V25-01 TC DALIAN SUNTIME INTERNATIONAL TRANSPORTATION CO. LTD C/P 18 JUNE 2014 - Anti-Tech Notice - Urgent**

Ni Hao!

Owners refer to their previous correspondence, including their last notice.

As advised, first hire and delivery bunkers is overdue.  Charterers are now in default and in breach of a condition of the charter-party to pay the hire punctually and in advance.

As mentioned further below, Charterers' failure to pay hire does not appear to be caused by any oversight, negligence, errors or omissions on the part of the Charterers or their bankers, as contemplated by clause 11(b), and therefore Charterers do not appear to be entitled to any grace period under clause 11 or at all.  Entirely without prejudice to all their rights, and without prejudice to their earlier notice, the Owners give this clause 11(b) notice.

In accordance with clause 11, payment of hire is to be made to Owners' bank, in funds available on the due date, in advance.  As the Owners have not received Charterers' payment advice details at all, there is no credible reason to believe that the Charterers' failure to make punctual and regular payment of hire is due to any oversight, negligence, errors or omissions on the part of the Charterers or their bankers such as to entitle the Charterers to 3 (three) clear banking days notice to rectify the failure as provided for in clause 11(b).

Nonetheless, without prejudice to all their rights, by this message the Owners do hereby give Charterers' notice pursuant to clause 11(b) of the charter party that the Charterers now have 3 (three) clear banking days to rectify the failure by making payment of the hire due.  Further take note that if the Charterers fail to pay the said hire within 3 (three) clear banking days of his notice the Owners shall withdraw the vessel pursuant to clause 11(a) strictly without prejudice to any claims they may otherwise have against the Charterers.

Charterers should also take note that, pursuant to the express terms of clause 11(a), at any time after the expiry of the 3 banking day grace period, and while the hire is still outstanding, the Owners shall, without prejudice to their right to withdraw, be entitled to withhold the performance of any and all of

1

their charter party obligations and shall have no responsibility whatsoever for any consequences of that suspension of the services, and in respect of which the Charterers shall be obliged to indemnify the Owners, and hire shall continue to accrue and any extra expenses resulting from such withholding shall be for the Charterers' account.

Best regards,

Capt. Kenny P. D'Silva

Eagle Shipping International (USA) LLC, as agents for Owners

Tel: 212 785 2500

AOH: 201 387 8193

2